# In the United States Court of Federal Claims

**No. 99-172C**
**(Filed: April 29, 2010)**

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * | * |
| | * |
| **GENERAL ELECTRIC** | * **Partial Summary Judgment; Post-** |
| **COMPANY,** | * **Retirement Benefits; Segment Closing** |
| | * **Adjustment; Cost Accounting** |
| Plaintiff, | * **Standards; CAS 403, 4 C.F.R. § 403;** |
| | * **CAS 406, 4 C.F.R. § 406.40; CAS 412;** |
| v. | * **4 C.F.R. § 412; CAS 413, 4 C.F.R. §** |
| | * **413; FAR 205-6(o), 48 C.F.R. § 31.205-** |
| **THE UNITED STATES,** | * **6(o)(1)** |
| | * |
| Defendant. | * |
| | * |
| * * * * * * * * * * * * * * * * * * | * |

*Richard D. Bernstein*, Washington, DC, for plaintiff. *Howard Stanislawski*, Washington, DC and *Alan C. Brown*, McLean, VA, of counsel.

*C. Coleman Bird*, U.S. Department of Justice, Washington, DC, with whom were *Assistant Attorney General Tony West*, and *Director Jeanne E. Davidson*, for defendant. *Stephen R. Dooley*, Defense Contract Management Agency, Boston, MA, of counsel.

*Karen L. Manos*, Washington, DC, for *amicus curiae* Raytheon Company. *Christyne K. Brennan*, Washington, DC, of counsel.

## O P I N I O N

Pending before the court are the parties' cross-motions for partial summary

judgment regarding the treatment of Pay-As-You-Go ("PAYG")[1] post-retirement benefit

---

[1]PAYG accounting is defined in the original version of Cost Accounting Standard ("CAS") 412.30(a)(12) as "[a] method of recognizing pension cost only when benefits are paid to

("PRB")[2] costs following the 1993 closing of two business segments formerly held by the

plaintiff, General Electric Company ("GE"): GE Aerospace ("GEA"), and GE Machinery

Apparatus Operation ("MAO").  This is the fifth decision in this case.[3]  At this stage, the

---

retired employees or their beneficiaries."  See 40 Fed. Reg. 43,873, 43,878 (Sept. 24, 1975).
PAYG accounting is an alternative to accrual accounting, in which costs are recognized as they
are earned by the employee and are allocated to government contracts at that time.  CAS
412.30(a)(1) defines the "accrued benefit cost method" as "[a]n actuarial cost method under
which units of benefit are assigned to each cost accounting period and are valued as they accrue –
that is, based on the services performed by each employee in the period involved."  See id.

[2]PRBs are not defined in the CAS.  However, the term "post-retirement benefit" is
defined in the Federal Acquisition Regulations ("FAR") as follows:

> PRB covers all benefits, other than cash benefits and life insurance benefits paid by
> pension plans, provided to employees, their beneficiaries, and covered dependents
> during the period following the employees' retirement. Benefits encompassed
> include, but are not limited to, post[-]retirement health care; life insurance provided
> outside a pension plan; and other welfare benefits such as tuition assistance, day care,
> legal services, and housing subsidies provided after retirement.

FAR 31.205-6(o)(1), 48 C.F.R. § 31.205-6(o)(1) (2010).

[3]On August 9, 2001, in the first decision, the court granted-in-part and denied-in-part the
parties' cross-motions for partial summary judgment, incorporating the reasoning set forth in
Teledyne, Inc. v. United States, 50 Fed. Cl. 155 (2001), aff'd sub nom. Allegheny Teledyne, Inc.
v. United States, 316 F.3d 1366 (Fed. Cir. 2003), cert. denied sub nom. Gen. Motors Corp. v.
United States, 540 U.S. 1068 (2003).  Order Granting-In-Part and Denying-In-Part the Parties'
Cross-Motions for Partial Summary Judgment, Gen. Elec. Co. v. United States, No. 99-172C
(Fed. Cl. Aug. 9, 2001).  On May 27, 2004, in the second decision, the court granted the
government's motion for partial summary judgment and denied GE's motion for partial summary
judgment on the parties' interpretations of their obligations under the GE Advance Agreement.
Gen. Elec. Co. v. United States ("GE I"), 60 Fed. Cl. 782 (2004).  On September 29, 2008, in the
third decision, the court granted-in-part and denied-in-part the parties' cross-motions for
summary judgment on the issue of whether the plaintiff's transfer of a net pension surplus
satisfied its segment closing obligations under CAS 413.  Gen. Elec. Co. v. United States ("GE
II"), 84 Fed. Cl. 129 (2008).  Finally, on October 24, 2008, in its fourth decision, the court ruled
on the interest rate to be used in a segment closing adjustment.  Gen. Elec. Co. v. United States
("GE III"), 84 Fed. Cl. 566 (2008).

court addresses whether GE's PAYG PRB costs are to be included as part of the segment

closing adjustments for pension costs required for each of the two segments under Cost

Accounting Standard ("CAS") 413.50(c)(12) ("CAS 413"), 4 C.F.R. § 413-50(c)(12)

(1986).[4,5]   For the reasons that follow, the court finds that GE's PAYG PRB costs are not

covered by CAS 413 and cannot be included in the GEA and MAO segment closing

adjustments.[6,7]

---

[4]CAS 413 was substantially revised in 1995.  All of the contracts at issue in this case
predate these changes.  As such, the segment closings in this case are governed by the original
CAS 413, which was promulgated in 1977 and became effective in 1978.  42 Fed. Reg. 37,191,
37,196 (Jul. 20, 1977).  References herein to "CAS 413" are to the original CAS 413 unless
otherwise noted.  Similarly, references to other CAS provisions are to those in effect during the
relevant time period unless otherwise noted.

[5]In <u>Allegheny Teledyne</u>, the Federal Circuit explained the basic concepts for determining
pension costs and for conducting segment closing calculations as follows:

> CAS 412 governs how a contractor determines its pension costs for each period – by
> the contractor's best actuarial estimate of the plan's anticipated earnings and benefit
> payments, taking into account the plan's past experience and reasonable expectations.
> . . . [CAS 413] provides for two related types of adjustments to a contractor's pension
> costs: (1) adjustments to account for the pension plan's actuarial gains and losses and
> (2) adjustments to account for a closed segment's pension surplus or deficit.  Under
> normal circumstances, the actuarial gains or losses (differences between the estimates
> and actual experience) are amortized in equal annual installments over a fifteen-year
> period.  This is not the case, however, when a "segment closing" occurs. . . .  In the
> event a contractor closes a segment, . . . CAS 413 provides that a contractor . . . shall
> determine the difference between the actuarial liability for the segment and the
> market value of the assets allocated to the segment . . . .  The difference between the
> market value of the assets and the actuarial liability for the segment represents an
> adjustment of previously-determined pension costs.

<u>Allegheny Teledyne</u>, 316 F.3d at 1371 (citations and internal quotation marks omitted).

[6] GE also has PAYG pension plans, which are not directly at issue in this motion.
Nonetheless, as discussed infra, the court's ruling regarding GE's PAYG PRB plans with non-
compellable benefits will also necessarily apply to GE's PAYG pension plans with non-

## STATEMENT OF FACTS

As stated above, this case involves the closing of two GE segments, the GEA and MAO segments.  The basic facts regarding the closing of these segments are discussed in detail in the court's prior decisions and will not be repeated here.  The following additional facts are not disputed.

As was the case with its pension plans, GE's PRB plans were offered to eligible GEA and MAO employees.  In contrast to most of GE's pension plans, however, GE reserved the right to modify or terminate its PRB plans at its own option.  GE employees cannot compel the payment of PRBs should GE elect to modify or terminate the benefits.  Also in contrast to most of its pension plans, GE did not account for PRB costs using accrual accounting.  Rather, GE accounted for PRB costs on a PAYG basis.  Under PAYG accounting, costs are recognized on the company's books for purposes of billing the government when the company pay the benefit to the employee.  Under "accrual

---

compellable benefits.

[7]In an opinion issued today in <u>Raytheon v. United States</u>, the court holds that the costs associated with non-vested and terminable at will PRB costs are not "pension costs" subject to adjustment under CAS 413.50(c)(12).  <u>See Raytheon v. United States</u>, No. 05-448 (Fed. Cl. Apr. 29, 2010)  In that case, Raytheon argued that it should have been able to include its pre-funded PRB costs in a segment closing adjustment on the grounds that its PRB costs met the definition of "pension plan" under CAS 412 and 413. The court determined that pension plans include only the costs associated with pension benefits that cannot be terminated at will by the employer and can be compelled by employees. <u>Raytheon</u>, No. 05-448, slip op. at 30-31, 36.

 That decision does not dispose of the issues in this case because GE does not contend that its PRB plans are "pension plans" within the meaning of  CAS 412 or 413.  Rather, GE argues that its PRB costs are subject to a segment closing adjustment because of the separate requirements established in CAS 402, 403 and 406.

accounting," however, the costs are recognized in the same accounting period in which an employee performs the work for which he or she earns the benefits, not at the time the company pays out the benefits to that employee or his or her beneficiary after retirement. Theoretically, PAYG and accrual accounting are designed to yield the same total amount of PRB costs over the lifetime of a PRB plan.

Although GE used PAYG accounting for its PRB costs for cost accounting purposes, it was nonetheless obligated to use accrual accounting for financial accounting purposes after the Financial Accounting Standards Board ("FASB") issued Statement No. 106 ("FAS 106") in 1990. See FASB, FAS 106, Employers' Accounting for Postretirement Benefits Other Than Pensions (Dec. 1990). FAS 106 was intended to provide investors with a truer picture of a public company's potential PRB liability. To this end, it required public companies to use accrual accounting for PRBs for financial reporting purposes (i.e., when appraising investors of their financial situation) even if they used the PAYG method when billing the government for PRB costs.[8] In addition to setting standards for accounting for these liabilities going forward, FAS 106 also required companies to recognize PRB liabilities incurred before FAS 106 went into effect, an obligation called the "transition obligation." FAS 106 at 8. FAS 106 provided two options for recognizing this obligation:

An employer can choose to immediately recognize the transition obligation as

---

[8]The purposes and application of FAS 106 are discussed in detail in Raytheon, also issued today. See Raytheon, No. 05-448, slip op. at 16-18.

the effect of an accounting change, subject to certain limitations.  Alternatively, an employer can choose to recognize the transition obligation in the statement of financial position and statement of income on a delayed basis over the plan participants' future service periods, with disclosure of the unrecognized amount.   However, that delayed recognition cannot result in less rapid recognition than accounting for the transition obligation on a pay-as-you-go basis.

Id. at 9.  GE chose the first option and immediately recognized a $2.71 billion unfunded

transition obligation on January 1, 1991.  From that date onward, in accordance with FAS

106, GE has accounted for newly incurred PRB liabilities on an accrual basis for financial

reporting purposes.

FAS 106 also provided guidance for companies dealing with a "plan curtailment."[9]

In this situation, any incurred but unrecognized PRB transition obligation must be fully

recognized on the companies' financial reports when the curtailment occurs.  It is not

disputed that "[c]urtailments include . . . discontinuing a segment of a business."  FAS 106

Para. 96.

Following promulgation of FAS 106, the government amended the Federal

Acquisition Regulations ("FAR") to address the allowability and payment of PRBs under

government contracts.  See FAR 31.205-6, 48 C.F.R. § 31.205-6(o) (1991).[10]  FAR

_____

[9]FAS 106 defines a plan curtailment as "an event that significantly reduces the expected years of future service of active plan participants or eliminates the accrual of defined benefits for some or all of the future services of a significant number of active plan participants." FAS 106 Para. 96.

[10]The CAS Board did not amend the CAS to expressly include PRBs.  As discussed in Raytheon, the CAS Board after much debate determined in 2001 that it would not promulgate a PRB cost accounting standard, stating, "'Because contractors need the flexibility to modify,

31.205-6(o) provides that "to be allowable in the current year, PRB costs must be paid" to an insurer, provider, other recipient or fund."  FAR 31.205-6(o)(2), 48 C.F.R. § 31.205-6(o)(2) (1991).  In GE's case, PRB costs, which are allocated to contracts using PAYG, are allowable and thus payable when the benefits are actually paid to the recipient of the benefit.

GE's PRB costs prior to the segment sales were paid by the government in proportion to the ratio of government contracts to private contracts.  GE's PRB costs after the segment sales continue to be paid by the government in proportion to the ratio of government contracting and private contracting.

When GE sold the GEA and MAO segments to Martin Marietta Corporation and Westinghouse Electric Corporation, respectively, GE retained the PRB obligations owed to GEA and MAO employees who had retired before the sale.  GE refers to these individuals as the "inactives."  GE continues to pay the PRB costs for the GEA and MAO inactives.  GE is also reimbursed for a portion of those PRB costs by the government in proportion to the ratio of government contracts to private contracts.  Because these costs are folded into GE's general overhead costs and distributed proportionally across all of

---

reduce, or even eliminate post-retirement benefits in the future in response to the pressures of medical inflation, an aging population, and global competition, the [CASB] finds that the liability for post-retirement benefits cannot be made sufficiently firm to be recognized for government cost accounting purposes without undue financial risk to both the contractor and the government. Therefore, the [CASB] has decided to discontinue further development of the rule proposed in the ANPRM.'"  Raytheon, 05-448, slip op. 21-22 (quoting 68 Fed. Reg. 53,312, 53,314 (Sept. 10, 2003)).

GE's contracts, however, the government now pays less of these costs. This is because the ratio of government to private contract work has changed.

The fact that the government is not paying as great of a percentage of the "inactives" PRBs costs following the sale of the GEA and MAO segments was recognized in an October 1995 memorandum written by the Defense Contract Management Command ("DCMC") which stated, "Because GE kept the [PRB] liability, the government saves money." DCMC Prenegotiation Memorandum on MMC-GEA "Pension Issue" at 6 (Oct. 19, 1995). Similarly, in 1995, the DCMC Contract Management Board of Review found that the PRB cost reductions at GEA were a "substantial benefit to the Government due to the purchase." DCMC Bd. of Review Meeting Summary at 1.

Following the sale of the GEA and MAO segments, the government, over GE's objections, determined that a segment closing adjustment under CAS 413 was required. In GE I, this court held that GE had to perform a segment closing adjustment on the pension costs attributable to both the active and inactive employees from the GEA and MAO segments. GE I, 60 Fed. Cl. at 796 (segment closing calculation must include both the actives and the inactives).

In its present motion, GE claims that its PAYG PRB costs must also be included in the CAS 413 segment closing adjustment. Because GE has not pre-funded its PRBs and pays for them on a PAYG basis as these costs come due, GE argues that the present value of the future PRBs GE will be required to pay to GEA and MAO inactives in the future

must be included in the CAS 413 segment closing calculation.

In the alternative, GE claims it is entitled to an offset or credit to account for the "benefit" the government has obtained because it is now paying a smaller percentage of inactive PRB costs than it would have paid had GE not sold the segments at issue because GE now has fewer government contracts against which it can charge PRBs. GE argues it may offset this "savings" from the pension surplus GE owes to the government as part of the CAS 413 segment closing adjustments for pension costs.

## HEARING OF EXPERTS

In support of their summary judgment motions, GE and the government offered the affidavits and testimony of William Keevan[11] and Anita C. Homburg,[12] respectively. Their affidavits and testimony were offered to explain the government accounting issues surrounding the measurement and payment of PRBs.[13] The testimony was not offered as opinion evidence as to the specific meaning of the CAS regulations, but did include

---

[11]Mr. Keevan is an auditor of government contractor financial statements and consultant with over thirty-five years' experience.

[12]Ms. Homburg has been a certified public accountant since 1990, with nearly twenty years' experience in government contracting with the Defense Contract Audit Agency.

[13]Due to the complexity of the interrelationship of the various CAS and FAR provisions to the measurement, allocation and payment of PRB costs, the court found it beneficial to hold a hearing of experts to explain how these provisions are applied in practice. The court has held such hearings at earlier stages of this litigation and in another CAS case. See GE II, 84 Fed. Cl. at 151 n.33; GE III, 84 Fed. Cl. at 569-71; Gen. Motors Corp. v. United States, 78 Fed. Cl. 336, 338 (2007) (utilizing the same type of hearing). Importantly, the court does not rely on the expert testimony in interpreting the language of CAS 413. As the Federal Circuit stated in Rumsfeld v. United Technologies Corp., 315 F.3d 1361, 1369 (Fed. Cir. 2003), expert testimony is irrelevant to the court's interpretation of the CAS, which is a question of law.

explanations as to how various CAS and FAR provisions are applied by accountants. There were no objections to the qualifications of the experts offered.

Although Mr. Keevan does not believe that the plain language of CAS 413 explicitly requires that PAYG PRB costs be included in a segment closing adjustment, he explained that there are several other CAS provisions that require GE to treat its PRB costs in the same manner as pension costs when conducting a segment closing adjustment pursuant to CAS 413.  In particular, Mr. Keevan testified that CAS 402.40, 4 C.F.R. § 402.40 (1992), CAS 403.40 ("CAS 403"), see 37 Fed. Reg. 26,680, 26, 684 (Dec. 14, 1972), and CAS 406.40(b) ("CAS 406"), 4 C.F.R. § 406.40(b) (1992), dictate that PAYG PRB costs be treated the same as PAYG pension costs under CAS 413.  Essentially, Mr. Keevan's interpretation of the CAS and its application to GE's PRB costs involves a three-step analysis.  First, Mr. Keevan notes that pension costs for which GE uses the actuarial accrual approach are included in a segment closing adjustment.  Next, because, according to Mr. Keevan, the CAS requires PAYG pension costs to be accounted for using accrual accounting, PAYG pension costs also should be included in a segment closing adjustment. For the final step, Mr. Keevan explains that PAYG PRB costs and PAYG pension costs are alike, and so PAYG PRB costs should be included in a segment closing adjustment, too.

Ms. Homburg, on behalf of the government, disputed Mr. Keevan's conclusions with regard to the interpretation of each of these CAS provisions.  She testified that PAYG

pension costs that cannot be compelled are not treated the same under CAS 412 and CAS 413 as actuarial accrued pension costs because they were accounted for using different accounting methods.  Ms. Homburg testified that the CAS 413 segment closing adjustment applies only to pension costs accounted for and allocated to government contracts based on accrual accounting.  According to Ms. Homburg, because GE's non-compellable PAYG pension costs are allocated to government contracts differently from GE's other pension costs under CAS 412,[14] the other CAS provisions authorize the government to treat these costs differently.  More specifically, because GE's non-compellable PAYG pension costs are allocated to government contracts based on PAYG accounting, not accrual accounting, the costs are not included in a CAS 413 segment closing adjustment.  Therefore, GE's PAYG PRB costs are not included in a CAS 413 segment closing adjustment through the operation of other CAS provisions.

   The court will discuss the testimony regarding each CAS provision in turn.

_____

   [14] Ms. Homburg testified that different treatment is required by the terms of CAS 412.40(c), which provides in pertinent part:

   Except for pay-as-you -go plans, the cost assignable to a period is allocable to cost objectives of that period to the extent that liquidation of the liability for such cost can be compelled . . . . For pay-as-you-go plans, the entire cost assignable to a period is allocable to cost objectives of that period only if the payment of benefits earned by plan participants can be compelled. If such payment is optional with the company, the amount of assignable costs allocable to cost objectives of that period is limited to the amount of benefits actually paid to retirees or beneficiaries in that period.

40 Fed. Reg. 43,873, 43,878.

A.     CAS 402

CAS 402.40 states, in pertinent part,

> All costs incurred for the same purpose, in like circumstances, are either direct costs only or indirect costs only with respect to final cost objectives. No final cost objective shall have allocated to it as an indirect cost any cost, if other costs incurred for the same purpose, in like circumstances, have been included as a direct cost of that or any other final cost objective. Further, no final cost objective shall have allocated to it as a direct cost any cost, if other costs incurred for the same purpose, in like circumstances, have been included in any indirect cost pool to be allocated to that or any other final cost objective.

4 C.F.R. § 402.40 (1992).

1.     Mr. Keevan's Testimony

According to Mr. Keevan, CAS 402 requires consistency in the allocation of all direct and indirect costs under all covered contracts. Mr. Keevan testified that under CAS 402, if GE's PRB costs are incurred for the same purpose and in like circumstances as GE's pension costs, GE's PRB costs must be treated in the same fashion as those pension costs for purposes of the CAS, including for purposes of CAS 413 (meaning that all these costs would be included in the CAS 413 segment closing adjustment). In this connection, Mr. Keevan explained that under CAS 412, all pension costs must be accounted for using accrual accounting for government contracting purposes regardless of whether they are ultimately allocated to government contracts using accrual or PAYG accounting. See CAS 412.50(b)(4), 40 Fed. Reg. 43,873, 43,879 ("The cost of benefits under a [PAYG] pension plan shall be measured in the same manner as are the costs of defined benefit plans."). Defined benefit plans, in turn, are accounted for using accrual accounting. See CAS

-12-

412.40(b)(1).  Thus, testified Mr. Keevan, by the operation of CAS 412.50(b)(4), PAYG pension costs must also be accounted for using accrual accounting.

   Mr. Keevan stated that in his view, GE's PRB costs were incurred for the same purpose and in like circumstances as GE's PAYG pension costs and therefore GE's PRB costs must be treated the same as PAYG pension costs under CAS 413.  Mr. Keevan acknowledged that GE's PAYG pension benefits cannot be compelled and therefore cannot be allocated to government contracts based on accrual accounting under CAS 412. See CAS 412.40(c) (mandating that if payment of PRBs cannot be compelled, the amount of assignable costs allocable to that period is limited to the amount of benefits actually paid . . . in that period.").  However, Mr. Keevan testified that it did not matter how costs have been allocated or "charged" to government contracts.  He explained that regardless of how PAYG costs are allocated to government contracts, they are still "incurred" for purposes of CAS 402 when the employee performs the service that makes him or her eligible for the benefit.  Hr'g Tr. 52:17-22, June 30, 2009 ("Keevan Tr.").  Mr. Keevan testified that the term "incurred" is not defined in CAS 402, but that under generally accepted accounting practices ("GAAP"), "incurred" means an economic activity that produces a future "obligation."  Keevan Tr. 48:11-19.  Mr. Keevan testified that PRBs are "incurred" when employees render the services necessary to earn the benefit, regardless of whether the costs are allocated to contracts on an accrual or PAYG basis.  Keevan Tr. 52:16-22.  Mr. Keevan testified that PAYG PRBs were incurred in like circumstances to

the pension costs subject to CAS 413 because both PRBs and pension benefits were earned by the same employees, at the same time, and for the same services.  For all of these reasons, testified Mr. Keevan, the government and GE must treat PAYG PRB costs the same as pension costs under CAS 413 by operation of CAS 402.

> 2.    Ms. Homburg's Testimony

Ms. Homburg took issue with virtually all of Mr. Keevan's opinions regarding the meaning and application of CAS 402 to the facts of this case.  She explained that CAS 402 is concerned with the allocation of costs to individual government contracts and that it is designed to protect against double billing on government contracts, which is not at issue in this case.  See Hr'g Tr. 257:16-20, July 1, 2009 ("Homburg Tr.") ("[W]hat [CAS] 402 is trying to guard against is a situation where a contract gets one hundred percent of its cost direct, and then it gets a portion of all the other contract costs of the same type indirect, so it's double counting.").  Ms. Homburg explained for the reasons set forth below that to the extent CAS 402 has any application to this case it does not mandate that pension costs and PRB costs be treated the same under CAS 413.

To begin, Ms. Homburg explained that government accounting for pension costs is governed by CAS 412.  Contrary to Mr. Keevan's contentions, Ms. Homburg testified that CAS 412 distinguishes between pensions that are accounted for using "accrual" accounting and pensions using PAYG accounting.  Ms. Homburg explained that under CAS 412, pension costs that are accounted for using accrual accounting may be allocated

to the government when the cost is "incurred" (i.e., when the working employee earns the benefit).  However, in Ms. Homburg's view, for pension plans using PAYG accounting, the contractor may not necessarily allocate the cost at the time that he working employee earns the benefit.  Rather, under CAS 412.40, the contractor may only allocate pension costs to government contracts when the benefits are earned by the employee if the pension benefit is "compellable" by the employee.  Homburg Tr. 236:1 to 240:21 (discussing CAS 412.40; see fn. 14 supra).  In other words, explained Ms. Homburg, PAYG pension plans with benefits that employees cannot compel cannot be allocated to government contracts on an accrual basis (i.e., when they are "incurred" or earned by the employee).  Rather, the contractor can only allocate the cost to the government contract when the benefit is actually paid as a benefit to the employee.  Thus, the non-compellable, PAYG pension cost is not "incurred" in the same manner as the compellable pension cost.  In other words, Ms. Homburg testified that CAS 412 specifically provides that the entire cost assignable to a period is allocable to cost objectives of that period <u>only if the payment of benefits earned by plan participants can be compelled</u>.  If such payment is optional with the company, the amount of assignable costs allocable to cost objectives of that period is <u>limited</u> to the amount of benefits actually paid. Thus under 412.40, PAYG pensions that are terminable at will by the employer are not allocated to government contracts based on accrual accounting and therefore no actuarial gains and losses have been allocated to government contracts for these pensions.

-15-

Ms Homburg further explained that to the extent GE's pension costs are compellable by employees, the costs were allocated to government contracts based on the use of accrual accounting, not PAYG accounting (the method by which GE's PAYG PRB costs were allocated). The pension costs compellable by employees also gave rise to actuarial gains and losses associated with accrual accounting and these gains and losses were allocated to its government contracts. In Ms. Homburg's view, how costs are accounted for and allocated to government contracts is the critical factor in deciding whether costs are incurred for the same purpose or in like circumstances. Because GE's non-compellable pension or PRB costs were not allocated to government contracts based on the use of accrual accounting, but were allocated to government contracts based on the amounts actually paid to beneficiaries (i.e., on a PAYG basis), Ms. Homburg testified that GE's compellable pension costs and non-compellable PAYG PRB costs were not incurred "for the same purpose" or "in like circumstances" and therefore non-compellable PAYG PRB costs do not have to be treated the same as compellable pension costs for purposes of CAS 402 or CAS 413.

B.    CAS 403

CAS 403.40 states, in pertinent part,

(a)(1)  Home office expenses shall be allocated on the basis of the beneficial or causal relationship between supporting and receiving activities. Such expenses shall be allocated directly to segments to the maximum extent practical. . . .

(a)(2)  No segment shall have allocated to it as an indirect cost. . . any cost, if other costs incurred for the same purpose have been allocated directly to that

or any other segment. . . .

(c) Residual Expenses (1) All home office expenses which are not allocable in accordance with paragraph (a) of this section and subparagraphs (1) to (5) of paragraph (b) of this section[15] and b shall be deemed residual expenses. . . . Residual expenses shall be allocated to all segments[.]

See 37 Fed. Reg. 26,680, 26,684.

    1.    Mr. Keevan's Testimony

Mr. Keevan testified that because GE "incurred" PAYG PRB costs for "the same purpose" as pension costs (i.e., to benefit retirees), GE is required under CAS 403.40(a)(2) to allocate pension costs for the GEA and MAO inactives to the GEA and MAO segments for purposes of the CAS 413 segment closing.  According to Mr. Keevan, CAS 403 requires GE to match up all of its PRB costs to the segments that generated the costs.  Mr. Keevan testified that because this court has ruled that GE must combine the pension assets it retained for its inactives from the GEA and MAO segments with the pension assets it later transferred for the GEA and MAO actives to perform a segment closing adjustment, GE must also include the unfunded PRB costs necessary to pay the GEA and MAO inactives in order to comply with CAS 403.  Mr. Keevan explained that under CAS 403, costs incurred for the same purpose must be treated the same for CAS purposes. Therefore, explained Mr. Keevan, GE's pension costs and PRB costs must be treated the same for purposes of CAS 413, and because the pension costs are to be included in the

---

[15]The parties do not contend that any part of paragraph (b) has any application in the instant case.

segment closing adjustment, the PRB costs must also be included.

2.    Ms. Homburg's Testimony

Ms. Homburg testified that Mr. Keevan's reading of CAS 403 is incorrect.  In Ms.

Homburg's view, CAS 403(a)(2) does not compel the same treatment of GE's PRB costs

and pension costs because, as with CAS 402, the difference in accounting treatment

mandates different treatment.  That is, the costs are not alike and thus CAS 403(a)(2) is

inapplicable.  Ms. Homburg explained that while pension costs accounted for using

accrual accounting give rise to actuarial gains and losses that are subject to a "settling up"

under CAS 413, non-compellable PAYG PRB costs could not, by their nature, give rise to

actuarial gains and losses that need to be settled up under CAS 413.  Therefore, Ms.

Homburg continued, GE's PAYG PRB costs have to be treated differently from the

accrued pension costs when a segment closes.  In particular, because the GEA and MAO

segments no longer exist, GE is allowed to allocate the non-compellable PRB costs

attributable to the GEA and MAO inactives to GE's other segments (including those

performing federal government contract segments) as "residual costs" under CAS

403.40(c), which it cannot do with accrued pension costs.

C.    CAS 406

CAS 406.40(b) states, "A contractor shall follow consistent practices in his

selection of the cost accounting period or periods in which any types of expense and any

types of adjustments to expense (including prior-period adjustments) are accumulated and

allocated." 4 C.F.R. § 406.40(b) (1992).

### 1.    Mr. Keevan's Testimony

Mr. Keevan testified that because PRB costs and pension costs are the same "types of expense" within the meaning of CAS 406, they must be treated the same under CAS 406.  Therefore, according to Mr. Keevan, PRB costs must be included in the same CAS 413 segment closing adjustment as the GEA and MAO pension costs.  Mr. Keevan testified that pension costs and PRB costs involve the same types of expense, and just as there is a need to settle up with the government with regard to basic pension costs where there are no future periods for payment, the same is true for PRB costs.

### 2.    Ms. Homburg's Testimony

Ms. Homburg challenged Mr. Keevan's assertion that PRB costs and pension costs are the same "types of expenses" under CAS 406.40(b).  Ms. Homburg again focused her testimony on the fact that GE's pension costs and PRB costs did not involve the same types of expense because these two categories of expenses were accounted for differently and allocated differently to government contracts under the CAS.  Ms. Homburg agreed with Mr. Keevan that expenses of the same type are accounted for in the same way, but she disagreed with Mr. Keevan that GE's pension and PRB costs at issue were, indeed, the same type of expense.  She testified that because GE used accrual accounting for its compellable pension plans, the costs associated with those plans should be subject to a segment closing adjustment under CAS 413.  However, in Ms. Homburg's view, the PRB

costs are a different type of expense because those costs were allocated to the government contracts based on PAYG accounting. Ms. Homburg concluded that costs given different accounting treatment are not of the "same" and do not have to be treated "consistently" for purposes of CAS 406.

D.    CAS 413

CAS 413.50(c)(12) states, in pertinent part,

> If a segment is closed, the contractor shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. The determination of the actuarial liability shall give consideration to any requirements imposed by agencies of the United States Government. In computing the market value of assets for the segment, if the contractor has not already allocated assets to the segment, such an allocation shall be made in accordance with the requirements of paragraph (c)(5)(i) and (ii) of this section. The market value of the assets allocated to the segment shall be the segment's proportionate share of the total market value of the assets of the pension fund. The calculation of the difference between the market value of the assets and the actuarial liability shall be made as of the date of the event (e.g., contract termination) that caused the closing of the segment. If such a date cannot be readily determined, or if its use can result in an inequitable calculation, the contracting parties shall agree on an appropriate date. The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs.

42 Fed. Reg. 37,191, 37,198 (Jul. 20, 1977).

1.    Ms. Homburg's Testimony

Ms. Homburg testified at length regarding her view that a segment closing adjustment for non-compellable PAYG pensions or PRB costs is precluded by the terms of CAS 413 because CAS 413 applies only to pension plans that are accounted and allocated

-20-

to government contracts based on accrual accounting.  Ms. Homburg explained that the

purpose of CAS 413 is to provide for measuring and assigning actuarial gains and losses.

Such gains and losses, Ms. Homburg explained, arise only when contractors allocate costs

to government contracts based on accrual accounting, not when they utilize PAYG

accounting methods.  This is because the actuarial assumptions used for accrual

accounting may differ from actual experience.  Under the terms of CAS 413.50(a)(2),

contractors are required to amortize or spread those actuarial gains and losses over a

fifteen-year period.  <u>See</u> 42 Fed. Reg. 37,191, 37,197.  However, when a segment is

closed, there are no future periods available in which to adjust those gains and losses and

so a segment closing calculation is performed.

As stated above, GE's PAYG PRB plans, in contrast were not allocated to

government contracts based on accrual accounting.  Accordingly, explained Ms. Homburg,

there were no actuarial gains or losses allocated to the GEA and MAO segments' contracts

to be adjusted.  Put another way, because GE's PRB costs were allocated to government

contracts based on the contractor's actual payments to the beneficiaries and did not include

actuarial gains or losses, there is nothing to "correct or adjust" for purposes of CAS

413.50(c)(12).

2.      Mr. Keevan's Testimony

In response to Ms. Homburg's testimony regarding the application of CAS 413, Mr.

Keevan testified that the CAS 413 segment closing adjustment is not limited to situations

involving actuarial gains or losses.  Mr. Keevan testified that CAS 413.50(c)(12), by its

plain terms, is focused on "actuarial liabilities."  According to Mr. Keevan, GE has an

"actuarial liability" in connection with its non-compellable PAYG PRB costs for the GEA

and MAO segments and therefore there is nothing in CAS 413.50(c)(12) that precludes GE

from including PRBs in a segment closing adjustment.

## DISCUSSION

I.   **Standard of Review**

A.   <u>Summary Judgment</u>

Summary judgment is appropriate when "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  RCFC

56(c)(1); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986); <u>Casitas</u>

<u>Mun. Water Dist. v. United States</u>, 543 F.3d 1276, 1283 (Fed. Cir. 2008); <u>Telemac</u>

<u>Cellular Corp. v. Topp Telecom, Inc.</u>, 247 F.3d 1316, 1323 (Fed. Cir. 2001) (citation

omitted).  In considering a motion for summary judgment, the court's role is not to "weigh

the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial."  <u>Liberty Lobby</u>, 477 U.S. at 249.  "The evidence of the nonmovant

is to be believed, and all justifiable inferences are to be drawn in his favor."  <u>Id.</u> at 255; <u>see</u>

<u>also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986);

<u>Lathan Co., Inc. v. United States</u>, 20 Cl. Ct. 122, 125 (1990); <u>Casitas Mun. Water Dist.</u>,

543 F.3d at 1283.  Cases involving only questions of law are particularly appropriate for summary judgment.  Dana Corp. v. United States, 174 F.3d 1344, 1347 (Fed. Cir. 1999).

B.    Interpretation of the CAS

The standard of review for a motion for summary judgment premised on the proper interpretation of a statute or regulation is well-settled.  Here, the primary dispute concerns the proper interpretation of the original CAS 413.50(c)(12) and it relationship to other CAS provisions, which involve questions of law.  See Rumsfeld v. United Techs. Corp., 315 F.3d 1361, 1369 (Fed. Cir. 2003) ("[T]he interpretation of CAS [] is an issue of law, not an issue of fact, as we have made clear in our prior decisions."); Billings v. United States, 322 F.3d 1328, 1332 (Fed. Cir. 2003) ("The underlying issue, one of statutory and regulatory construction, is a question of law . . . .").  Where, as here, all of the parties' factual assertions are taken as true, summary judgment on the legal issue is appropriate.  See, e.g., Santa Fe Pac. R. Co. v. United States, 294 F.3d 1336, 1340 (Fed. Cir. 2002) ("Issues of statutory interpretation and other matters of law may be decided on motion for summary judgment."); Costain Coal, Inc. v. United States, 126 F.3d 1437, 1440 (Fed. Cir. 1997).

In evaluating the meaning of the original CAS 413.50(c)(12), the Federal Circuit has held that the court must be guided by the CASB's intent in promulgating the standard.  Perry v. Martin Marietta Corp., 47 F.3d 1134, 1137 (Fed. Cir. 1995) ("our task in interpreting the meaning of these . . . provisions is ultimately to ascertain the CASB's

intended meaning when it promulgated the CAS" (citing <u>Riverside Research Inst. v.</u>

<u>United States</u>, 860 F.2d 420, 422 (Fed. Cir. 1988))).  The Federal Circuit explained in

<u>Allegheny Teledyne</u>:

> When interpreting provisions of the CAS our task is "to ascertain the [CASB's]
> intended meaning when it promulgated the CAS."  We accomplish this first by
> looking at the text of the relevant provisions and "any guidance that the
> [CASB] has published to aid in interpretation."  We examine the issues . . .
> through this interpretive lens.

316 F.3d at 1373 (quoting <u>Perry</u>, 47 F.3d at 1137) (internal citations omitted).  Thus, the

court must "first look to the authority of the CASB, the regulatory framework within

which CAS 413 operates, its plain language, and its regulatory history to determine the

proper meaning of the original and amended CAS 413.50(c)(12)."  <u>Teledyne</u>, 50 Fed. Cl.

at 161-62.

II.     **The Cost Accounting Standards Do Not Authorize or Permit a Segment
        Closing Adjustment of Non-Compellable PRB Costs Accounted for and
        Allocated to Government Contracts on a PAYG Basis.**

        A.      <u>The Positions of the Parties</u>

        At the core of GE's argument is its contention that pension plans accounted for

using PAYG accounting must be treated the same as pension plans accounted for using

accrual accounting and therefore PRB plans using PAYG accounting must be treated the

same as pension plans using accrual accounting for purposes of CAS 413, meaning that

the costs associated with PAYG PRB plans must be included in the segment closing

adjustment.  GE supports this claim by relying on the language of CAS 412 with regard to

PAYG pension plans and then applies the conclusions it draws from that provision to other CAS provisions.  GE argues that although PAYG PRB plans are not directly covered by a CAS 413 segment closing adjustment, they must nevertheless be included because of the operation of other CAS provisions must be included in the segment closing adjustment.  In particular, GE claims that provisions found in CAS 402, CAS 403, CAS 406, and CAS 412, when read together, mandate that costs incurred for the same purpose or involving the same types of expenses must be treated the same for purposes of CAS 413.

GE's argument begins with CAS 412.50(b)(4), which provides that PAYG pension plans are to be "measured in the same manner as are the costs of defined-benefit plans whose benefits are provided through a funding agency."  4 C.F.R. 412.50(b)(4).  Defined benefit plans are measured under CAS 412 using "accrual accounting."  CAS 412.40(b)(1).  Therefore, PAYG pension plans must be measured using accrual accounting as well, regardless of the fact that the costs are ultimately billed on a PAYG basis.  For this reason, GE argues, because its PAYG pension plans are measured using accrual accounting, its PAYG PRB plans must also be accounted for using accrual accounting for CAS purposes.  Continuing this reasoning, GE next argues that because PAYG pension plans are accounted for using "accrual accounting," they must be included within a segment closing adjustment under CAS 413.  Thus, argues GE, PAYG PRB plans must also be included.

GE rejects the government's contention that only pension plan costs that are

measured and allocated to government contracts using accrual accounting are to be included in a CAS 413 segment closing adjustment.  GE recognizes that under CAS 412, PAYG pension plans that do not have compellable benefits cannot be allocated to government contracts based on accrual accounting, but GE argues that how costs are allocated to government contracts is irrelevant.  According to GE, it does not matter whether the contractor has allocated actuarial gains and losses to the government for purposes of the segment closing provision.  GE argues that the segment closing provision, CAS 413.50(c)(12) applies regardless of whether the pension costs were allocated to government contracts based on accrual accounting with actuarial gains and losses.  GE argues that CAS 413.50(c)(12) refers only to "actuarial liability," not "actuarial gains and losses," and that because it has an "actuarial liability" with regard to its non-compellable PAYG PRB plans, it must include its unfunded, non-compellable PRB liabilities in the segment closing adjustment.  GE concludes that CAS 402, 403 and 406 require it to include the actuarial liability associated with the PRBs it has retained for the GEA and MAO inactives in the CAS 413 segment closing adjustment for pension costs.

The government argues in response that GE's argument is based on a fundamentally flawed premise – namely, that a CAS 413 segment closing adjustment can include pension costs that were not <u>allocated</u> to government contracts on the basis of accrual accounting. The government argues that CAS 413, when read in its entirety, makes plain that its focus is on the assignment, measurement and allocation of pension costs that are accounted for

using accrual accounting.  The government contends that GE's analysis of CAS 412 and

413 impermissibly ignores the distinction drawn by the CAS Board between PAYG

pension plans with benefits that can be compelled and PAYG plans with benefits that

cannot be compelled.  The government contends that only those PAYG pension plans that

have <u>compellable</u> benefits may be allocated to government contracts on an accrual basis

and therefore only pension plans with compellable benefits have had costs allocated to the

government that include the actuarial gains and losses subject to a CAS 413 segment

closing adjustment.  The costs associated with PAYG pension plans that do not have

compellable benefits are not been allocated to government contracts on an accrual basis.

Therefore, the contractor has not allocated actuarial gains and losses to the government

that must be adjusted when the segments are closed.  Put another way, without actuarial

gains and losses that were being amortized in accordance with CAS 413.40, there are no

"previously-determined pension costs" to be adjusted in a segment closing adjustment.

       The government disagrees with GE that the segment closing adjustment was

intended to provide a one-time settling up for all pension costs in cases where payment

was "deferred" either through accrual or PAYG accounting.  The government argues that

GE's reliance on the phrase "actuarial liabilities" in CAS 413.50(c)(12) is misplaced.  The

government contends that "actuarial liabilities" cannot be read out of context and that in

the context of CAS 413, including the illustrations provided for in the regulation and the

regulation's preamble, the CAS Board clearly intended to include only those previously

determined pension costs that included actuarial gains and losses in a CAS 413 segment closing adjustment.

Finally, the government argues that there is nothing in CAS 402, CAS 403 or CAS 406 that compels a different result. According to the government, the differences between the accounting requirements for compellable pension costs and non-compellable pension costs established in CAS 412 compel a different treatment for non-compellable pension and PRB costs under CAS 402, CAS 403, CAS 406 and CAS 413. For the reasons that follow, the court agrees with the government.

> 1. The CAS 413 segment closing provision applies only to accrued pension plans that were required to account for actuarial gains and losses.

The court agrees with the government that GE's argument is based on a fundamental misunderstanding of CAS 413 and the purpose of the segment closing adjustment. CAS 413 was first promulgated in 1977 to "provide guidance for adjusting pension cost by <u>measuring</u> actuarial gains and losses and <u>assigning</u> such gains and losses to cost accounting periods." CAS 413.20, 4 C.F.R. § 413.20 (1977). CAS 413.30(a)(3), 4 C.F.R. § 413.30(a)(3) (1977), defines actuarial gains and losses as "[t]he effect on pension cost resulting from differences between actuarial assumptions and actual experience." CAS 413.50(a)(1), 4 C.F.R. § 413.50(a)(1) (1977), requires that "in accordance with the provisions of [CAS 412], actuarial gains and losses . . . be identified separately from unfunded actuarial liabilities being amortized." Under CAS 413.50(a)(2), contractors are

required to amortize their actuarial gains and losses over a fifteen-year period.  CAS

413.50(a)(2), 4 C.F.R. § 413.50(a)(2) (1977).

The purpose of the CAS 413 segment closing adjustment was explained by the

Federal Circuit in Allegheny Teledyne, 316 F.3d at 1374.  In affirming this court's

decision, the Circuit stated, "[T]he Board intended the segment closing provision to apply

in situations where 'there are no future periods in which to adjust' the appropriate costs.

Thus, it applies to situations where, for whatever reason, the segment's contracts have

become separated or closed off from the pension costs." Allegheny Teledyne, 316 F.3d at

1374 (quoting 4 C.F.R. § 413, pmbl. A (citation omitted) (emphasis added)).

Thus, the reason that CAS 413.50(c)(12) does not extend to GE's PAYG PRB costs

is that CAS 413 provides a means to sort out actuarial gains and losses and does not

extend to situations where no such actuarial gains and losses were ever allocated to

government contracts.  Actuarial gains and losses only arise in the context of accrual

accounting.[16]  Accrual accounting is based on the use of actuarial assumptions.  See CAS

412.30(a)(3) (defining "actuarial cost method" as "[a] technique which uses actuarial

assumptions to measure the present value of future pension benefits).  When those

assumptions prove to be incorrect when tested by real experience there are actuarial gains

and losses.  See CAS 412.30(a)(4) (defining "actuarial gain and loss" as "[t]he effect on

pension cost resulting from differences between actuarial assumptions and actual

_____

[16]See Dan M. McGill et al., Fundamentals of Private Pensions 599-602 (9th ed. 2010), for
a discussion of accrual accounting and the need to account for actuarial gains and losses.

experience.").

Pension plans funded using PAYG accounting that do not have compellable benefits have not been allocated to contracts based on actuarial determinations. Accordingly, these non-compellable PAYG costs have not been allocated to government contracts based on actuarial assumptions, assumptions that, while meant to be as accurate as possible, inevitably result in over or under payments.  Because non-compellable PAYG costs have been allocated to government contracts based only on the actual payments made to retirees, no assumptions were used and no costs based on actuarial gains or losses were allocated to government contracts.  In such circumstances, there are no "previously determined costs" that need to be adjusted in a CAS 413 segment closing adjustment.

GE's contention that CAS 413.50(c)(12) includes non-compellable PAYG pension costs because it speaks only of "actuarial liabilities" regardless of how costs have been allocated to government contracts is not supported.  GE argues that it can calculate an actuarial liability for its segments. However, GE's ability to calculate an "actuarial liability" is not enough to include its  non-compellable costs in a segment closing adjustment.  The segment closing provision in CAS 413 was promulgated to address the treatment of actuarial gains and losses allocated to government contracts when future periods for sorting out those actuarial gains and losses are terminated by a segment closing.  GE's suggestion that the segment closing provision was intended to provide for a settling-up in any situation where pension costs have been simply "deferred" either

through accrual accounting or PAYG accounting renders the distinctions the CAS Board

drew  between the allocation of costs under accrual and PAYG accounting in CAS 412

and 413 meaningless.

The court cannot construe a regulation to render the provision meaningless.  See

United States v. Castrillion-Gonzalez, 77 F.3d 403, 406 (11th Cir. 1996) (noting the "well-

established axiom of statutory construction that a statute is to be interpreted so that no

words shall be discarded as being meaningless, redundant, or mere surplusage. (internal

quotation marks omitted)).  Nor can it construe a regulation without regard to its context.

Teledyne, 50 Fed. Cl. at 161-62; Griffin v. Sec'y of Veterans' Affairs, 288 F.3d 1309,

1331 (Fed. Cir. 2002) ("Challenged terms must be read in context of the regulation as a

whole").  Thus, CAS 413.50(c)(12) must be read together with the other provisions of the

regulation.  It is clear from the context of CAS 413 as a whole that it deals with the

actuarial gains and losses associated with pension costs that have been accounted for and

allocated to government contracts based on accrual accounting.  The only situation in

which accrual accounting (and therefore, actuarial assumptions) is used to determine costs

in connection with PAYG pensions is when the beneficiaries can compel benefits.  See

CAS 412.30.[17]  Where the PAYG pension benefits are not compellable, accrual accounting

---

[17] GE argues that just as this court has held in a different context that the constraints in
CAS 412 should not apply where they conflict with CAS 413, the court should not allow the
allocation rules in CAS 412 to bar GE's right to a segment closing adjustment for non-
compellable PRB costs in this case.

The court rejects GE's invitation to read out of CAS 413 the allocation rules in CAS 412.
In General Motors v. United States, 66 Fed. Cl. 153 (2005), and Viacom, Inc. v. United States,

cannot be used to determine pension costs.  Id.  In such circumstances, there are no

previously-determined costs to be adjusted.  The fundamental premise supporting GE's

argument must be rejected.  In short, the CAS 413 segment closing adjustment provision

simply does not apply to non-compellable PRB costs that are accounted for and allocated

to government contracts and segments using PAYG accounting.[18]

 2. Nothing in CAS 402, 403 or 406 Requires or Permits a Segment
 Closing Adjustment for GE's Non-Compellable PRB costs.

 a. CAS 402

CAS 402(c), as noted above, requires that "all costs incurred for the same purpose,

in like circumstances, are either direct costs only or indirect costs only with respect to final

cost objectives."  GE argues that under CAS 402, PRB costs must be included in the

segment closing adjustment of basic pension costs on the grounds that pension costs and

PRB costs are "incurred for the same purpose and in like circumstances" and therefore

must be allocated to cost objectives in the same manner.

---

70 Fed. Cl. 649 (2006) the court determined that the pre-funding requirement for allocating
pension costs could not apply to the CAS 413 segment closing adjustment because this would
mean that there could never be a "settling up" of pension costs where there was a pension deficit.
See Gen. Motors, 66 Fed. Cl. at 159; Viacom, 70 Fed. Cl. at 656.  The court explained that in
order to give both CAS 412 and CAS 413 meaning, the CAS Board could not have intended to
have the pre-funding requirement apply to a segment closing adjustment.
    Here, however, there is no conflict between CAS 412 and CAS 413.  To the contrary,
CAS 412 defines what costs will be covered by CAS 413.  42 Fed. Reg. 37,191, 37,195 Pt. 412,
pmbl. A.  Accordingly, the court has no reason to ignore the CAS 412 allocation rules for non-
compellable pension costs.

    [18] Whether a CAS 413 segment closing adjustment would be required for PAYG pension
benefits that can be compelled is not at issue in this case and this opinion does not address that
question.

GE relies on the GAAP definition of "incurred" to support its contention that regardless of when its PRBs are paid to beneficiaries, the costs were "incurred" before the obligation to pay arose. Quoting from FAS 106, GE states that for PRBs, "Employers have generally recognized the obligation and related costs from the exchange as the obligation was satisfied rather than when it was incurred." FAS 106 para. 142. Relying on this provision, GE argues that the obligation to pay PRBs is separate from satisfying that obligation. GE also relies on the FAR provision on PRBs, which also draws a distinction between when PRBs are "incurred" and when they are "paid." See FAR 31.205-6(o)(2), 48 C.F.R. § 31.205-6(o)(2).

GE argues that PRBs and pension costs are incurred for the same purpose in that both are designed to provide retirement benefits. See FAS 106 para. 147 ("Postretirement benefits are a form of pension benefits in kind. Unlike traditional cash pension benefits, the employer promises to provide defined benefits or services as the need for those benefits or services arises or on the occurrence of a specified event. Typically, those postretirement benefits supplement cash benefits paid after retirement. Regardless of the form of the benefit — in cash or in kind — the underlying promise is the same. In exchange for service over a specified period, the employer will provide the employee and any covered dependents or beneficiaries with the defined postretirement benefits.").

The government argues that GE's reliance on CAS 402 is misplaced because it does not address the allocation of costs to segments and thus it is not relevant to determining

whether GE must include its PRB costs in the segment closing adjustment.  In the alternative, the government argues that CAS 402 does not mandate the inclusion of PRB costs in a segment closing adjustment because GE's PRB costs were not "incurred for the same purpose" or "in like circumstances" as GE's basic pension costs.  The government argues that for CAS purposes, costs are only considered to be "incurred" when they can be compelled by the plan participant or when the benefit is actually paid. Thus, GE's non-compellable PRB costs were not "incurred" at the same time that its compellable pension costs were incurred.  According to the government, GE's non-compellable PRB costs were only "incurred" for CAS purposes when GE paid the benefit.  To be "incurred" for the same purpose and in like circumstances for government accounting purposes under the CAS, the government argues, means that the costs were accounted for in the same way.

The court agrees with the government that CAS 402 is wholly irrelevant to the issue at hand.  This case concerns the allocation of costs to segments, not to individual cost objectives within segments.  Therefore, CAS 402 has no application to this case. However, even if CAS 402 were relevant to the question of whether non-compellable PRB costs should be included in a segment closing adjustment, GE's reliance on CAS 402 would still be misplaced because GE's basic pension costs and its PAYG non-compellable PRB costs involve very different types of "costs" and thus the costs need not be treated the same for CAS 402 purposes.  As discussed below in connection with CAS 403, because GE's PRB costs and basic pension costs were not "incurred" for the same purpose, GE's

PRB costs and basic pension costs may be treated differently without violating CAS 402.

      b.    CAS 403

GE argues that CAS 403 requires that PRB costs for the GEA and MAO inactives must be allocated to the GEA and MAO segments along with the pension costs at the time of the segment closing because CAS 403 does not allow a contractor to allocate an expense as a "residual expense" if the cost was incurred for the same purpose as another cost that had to be allocated to a specific segment.  See CAS 403(c), 37 Fed. Reg. 26,680, 26,685.  GE also argues that under CAS 403, expenses must be allocated on the basis of the "beneficial or causal relationship" giving rise to the expense, and that PRB costs for the GEA and MAO inactives must be therefore allocated to the GEA and MAO segments and included in the segment closing adjustments under CAS 413.[19]  Pl.'s Post-Hr'g Br. on Affirmative Cl. PAYG PRBs and Offset PAYG and Pension Liabilities ("Pl.'s Nov. 2009 Br.") 17.  Based on the same arguments it made in connection with CAS 402, GE contends with regard to CAS 403 that regardless of when PRB benefits are paid, the costs are "incurred" for CAS purposes when they are earned by the employee.  Id. at 18.

The government disputes GE's contention that GE's pension and PRB costs were "incurred for the same purpose" and argues that for this reason, pension costs and PRB costs are properly treated differently without violating CAS 403.  The government further argues that GE can properly allocate the PRB costs to all segments as a "residual" expense

---

[19]Raytheon makes this same argument.  See Raytheon, No. 05-448, slip op. at 42-43.

under CAS 403.[20]   According to the government, nothing in CAS 403.40(a)(1) governs the allocation of costs based on the "beneficial or causal relationship between supporting and receiving activities" so as to require that expenses that have not yet been paid be allocated to segments in advance in order to undertake a segment closing.  Def.'s Post-Hr'g Reply Br. Addressing Remaining PRB Issues ("Def.'s Jan. 2010 Br.") 6-7.  According to the government, liability for non-compellable PRB costs must be established before the cost can be allocated to a segment.  It is for this reason that GE is authorized to allocate its PRB costs to all segments as a residual expense after a segment closes.

The court agrees with the government's reading of CAS 403.  First, the court finds that GE's reading of the phrase "incurred for the same purpose" in CAS 403 is incorrect. In explaining the reasons behind the promulgation of CAS 412, the CAS Board made clear in CAS 412 that "certain of these criteria [referring to financial accounting criteria in place at the time] are not appropriate for Government contract costing purposes."  40 Fed. Reg. 43,873, 43,874 Pt. 412, pmbl. A.  This language serves to highlight that the CAS Board did not intend for these costs to be treated the same in every situation as they were under financial accounting principles.  Moreover, regardless of how the term "incurred" is used

---

[20]In an amicus brief filed by Raytheon, Raytheon argues that this court's decision in GE I mandates that all costs associated with GE's GEA and MAO inactives be treated the same.  See Raytheon's Post-Hr'g Amicus Br. Addressing Question 3.A. 11-12.  Raytheon argues that GE I was wrongly decided and asks that the court reconsider its ruling in its earlier opinion. The government has moved to strike Raytheon's brief and argues that it is an inappropriate use of briefing to call for reconsider of an earlier decision.  The court agrees with the government. Accordingly, Raytheon's brief will not be considered.

for financial accounting purposes, it is clear that the CAS Board does not consider non-compellable PAYG pension costs to be "incurred" for government accounting purposes until they are paid to the beneficiaries and thus it will not allow a contractor to allocate a PAYG pension cost allocable to a government contract unless the contractor can establish that it is "liable" for that cost. The CAS Board stated that the "underlying concept of [CAS 412]" was to allow for the accrual of pension costs only "when a valid liability exists." 40 Fed. Reg. 43,873, 43,876 Pt. 412, pmbl. A. Where payment is non-compellable, no such liability can be said to exist. It is for these reasons that the court finds that for government accounting purposes, the word "incurred" means the incurrence of a "valid liability." Therefore, GE's reliance on FAS 106 or the FAR to define "incurrence" for CAS purposes is misplaced.

In <u>Raytheon</u> the court in construing CAS 403 held that non-compellable PRB costs and pension costs are also not incurred for the same purpose because they offer very different levels of retirement security. The pension costs subject to CAS 413's segment closing provision are vested, compellable, and protected benefits under ERISA. <u>See</u> <u>Raytheon</u>, 05-448, slip op. at 11-12. Non-compellable PRBs, in contrast are not vested, cannot be compelled and therefore can be terminated at will by the employer, and are not protected under ERISA. In such circumstances, pension benefits and non-compellable PRBs do not provide the same level of retirement security and therefore cannot be said to have been incurred for the same purpose.

-37-

Moreover, given the lengths the CAS Board went to in CAS 412 to require that only costs that could be legally compelled could be allocated to government contracts, the plaintiff cannot credibly contend that the CAS Board intended for the requirement to be undone through CAS 403.  It is well-established that express provisions take precedence over general provisions.  See Inter-Coastal Xpress, Inc. v. United States, 296 F.3d 1357, 1369 (Fed. Cir. 2002) (holding that more general provisions in a younger act did not displace more specific ones found in an older one) (citing Dalton v. Sherwood Van Lines, Inc., 50 F.3d 1014, 1017-18 (Fed. Cir. 1995)).  Here, the specific criteria in CAS 412 for allocating costs mandate that non-compellable PAYG PRB costs not be allocated to the GEA and MAO segments for purposes of a segment closing.

Therefore, even though GE must allocate pension assets and liabilities for inactives to the GEA and MAO segments as part of the segment closing adjustment,[21] the CAS does not allow GE to allocate its non-compellable PAYG PRB liabilities to the GEA and MAO segments.  Rather, as they are paid, those liabilities will remain in GE's indirect cost pool and GE can continue to allocate them to its ongoing segments (including those performing

---

[21]The court notes that if GE were not required to include the pension assets attributable to the inactives in the GEA and MAO segment closing adjustments, GE would be able to impermissibly shelter a significant government overpayment from a segment closing adjustment. This potential benefit to contractors at the expense of the government was noted by this court in GE I, 60 Fed. Cl. at 794-96 (noting that this might result in a windfall of $500 million or more to GE).

government contracts) as a residual expense under CAS 403.40(c).[22]

  c.  CAS 406

CAS 406 requires a contractor to follow a consistent practice in selecting the accounting period in which "any types of expense and any types of adjustment to expense (including prior-period adjustments) are accumulated and allocated." 4 C.F.R. § 406(b). GE argues that PRB costs and pension costs involve the "same types of expense" and therefore, in accordance with CAS 406, pension costs and PRB costs must be treated the same for purposes of CAS 413.50(c)(12).

  The government argues that CAS 406 is not applicable to the issue before the court because it deals with the problem of contractors assigning the same expense to different accounting periods and not with the assignment of costs to a segment. The government also argues that CAS 406 is irrelevant to the issue of whether non-compellable PRB costs

--------

[22]GE's reliance on the February 7, 1995 memorandum of Carol Covey, Deputy Director of Cost, Pricing and Finance in the Office of the Under Secretary of Defense to the effect that there is no "beneficial or causal relationship between the retiree medical costs and the cost objectives to which the costs are allocated" and thus GE may not allocate PRB costs as a residual expense is misplaced. See App. to Pl.'s Nov. 2009 Br. 376 (Memorandum from Carol F. Covey to the Executive Director for Contract Management, Defense Contract Management Command (Feb. 7, 1995)). Ms. Covey's interpretation of the CAS is not binding. Moreover, the government now agrees that GE may allocate its PRB costs as residual costs, as provided for in CAS 403. See Def.'s Jan. 2010 Br. 12.

  GE's reliance on Department of Energy (DOE) Order 3890.1A is also misplaced. In the DOE Order, DOE agreed to pay future PRBs earned by employees of DOE contractors under DOE's Management and Operating contracts at certain nuclear facilities. See App. to Pl.'s Nov. 2009 Br. 387 (U.S. Dep't of Energy, Order Concerning Contractor Insurance and Other Health Benefit Programs (June 12, 1992). That DOE has agreed to continue to pay those PRBs as a matter of contract does not mean that payment is mandated by CAS 403. The terms of that agreement are beyond the scope of this litigation.

must be treated the same as pension costs accounted for using accrual accounting because, for the reasons discussed above, the two types of costs are not the "same types of expense."

The court agrees with the government that CAS 406 has no application to the issue before the court. The stated purpose of CAS 406 is to "promote uniformity and comparability in contract cost measurements." 4 C.F.R. § 406.10 (1992); see also 38 Fed. Reg. 30,732 Pt. 406, pmbl. A (further explaining the purpose of CAS 406). The regulation is completely silent as to the treatment of non-compellable PRBs in the context of a segment closing. Moreover, as explained above, it is clear that pension costs subject to a segment closing adjustment and non-compellable PAYG PRB costs are not accounted for in the same manner and therefore do not involve the same "types" of expenses. Thus, CAS 406 has no application to the instant case, which involves only the latter type of expenses. For all of these reasons, GE's arguments regarding CAS 406 are rejected.

B.     The Government Is Not Required to Give GE a Credit for Any Cost Savings Associated with GE's Not Transferring the Inactives in the Segment Sale.

GE argues that if it is not entitled to a CAS 413 segment closing adjustment for its PAYG PRB costs, it is nonetheless entitled to some credit or offset based on the government's alleged cost savings attributable to GE's decision not to transfer its PRB cost obligations to the new owners as part of its segment sales.[23]  GE contends that it

---

[23]GE argues that under the Federal Circuit's holding in Anchor Savings Bank, FSB v. United States, 597 F.3d 1356 (Fed. Cir. 2010), offsets are required.  In Anchor Savings, the Circuit held that "where it is necessary to fashion an appropriate award, a court may consider

should be able to deduct the cost savings from the amount of pension surplus it owes to the government under the Credits clause, 48 C.F.R. § 31.201-5 (1993).[24]  GE argues that if the government does not give GE credit for the savings, the government will obtain a windfall in contravention of the CAS authorizing legislation, which provides that "in no case shall the Government recover costs greater than the increased cost . . . to the Government, in the aggregate, on the relevant contracts . . . unless the contractor made a change in its cost accounting practices . . . which it failed to disclose to the Government."  41 U.S.C. § 422(h)(3) (1993).

The government argues that GE is not entitled to any offset or credit for any "savings" allegedly created by GE's decision not to transfer the PRB liability of inactives to the new owners as part of the segment sales.  It asserts that it has not "saved" any PRB costs following the segment closing because the government never agreed to reimburse PAYG PRB costs on anything other than the ratio of government contracts available for allocation at the time the PRB costs are paid to beneficiaries.  The government contends

───────────────

post-breach evidence when determining damages in order to place the non-breaching party in as good a position as he would have been had the contract been performed."  Id. at 1369-70.  At oral argument, counsel for GE argued that Anchor Savings applies to the instant case "by analogy" and the court should look at the fact that "[t]he government is already in a better position than it would have been in had there been no segment closing, and to give it more money is contrary to the CAS authorizing statute, the credits clause, the CAS provisions, and lots and lots of law."  Oral Arg. Tr. 128:23-24, 129:21-25.

[24]In GE II, the court concluded that "the government must consider any cost-saving benefits it obtained from the pension surplus transferred to the buyers in determining whether GE satisfied its segment closing adjustment obligations."  GE II, 84 Fed. Cl. at 131.

that it will continue to reimburse GE for its PAYG PRB costs on the same terms as it

always has reimbursed GE (i.e., on a PAYG basis).  By electing to use PAYG accounting,

the government argues, GE assumed the risk that the ratio of GE's government contracts to

private contracts might be lower when it came time to pay benefits.  The government

concludes that the alleged "cost savings" GE claims the government has obtained is

nothing more than the logical outcome of GE's accounting decision.

The court agrees with the government.  As noted above, the court has previously

determined that under the Credits clause, 48 C.F.R. § 31.201-5, to the extent the

government has received a cost reduction attributable to the excess pension costs over and

above the amount necessary to pay for the "actives" GE transferred to the new companies

in the segment sales, the government must give GE credit for that actual cost savings in

contracts with the new segment owners.  GE II, 84 Fed. Cl. at 131.  Put another way, the

court concluded that GE may have satisfied its payment obligation to the government for

the pension surplus attributable to government contributions that it retained following the

segment sales, at least in part, by the value of the excess pension assets it transferred to the

new GEA and MAO owners with the government's knowledge and acquiescence.  This is

because the transfer of additional pension assets to the segment buyers may have reduced

the overall pension costs those companies now charge the government for pension costs.

GE's contention that the government has similarly "saved" PRB costs is mistaken.

The government has not received a cost savings because under the CAS GE could only

allocate PRBs once they were paid.  Thus, GE can only allocate its PAYG PRB costs to contracts based on the ratio of government to private contracts that are in effect at the time the costs are paid.  Now that the GEA and MAO segments are closed, CAS 403(c) allows GE to continue to allocate PRB costs as residual expenses to all segments.  If GE decides to take on more government contracts, it will be able to allocate a greater percentage of PRB costs to those contracts.  Thus, the government has not received a "cost reduction," attributable to the segment closing.[25]

GE's reliance on the CAS windfall provision, 41 U.S.C. § 422(h)(3), is equally misplaced.  The government has not obtained a "windfall" by virtue of GE's decision to sell the GEA and MAO segments.  The CAS does not contemplate that every business change which triggers a cost change be corrected to avoid a windfall.  Rather, the government is not entitled to a windfall in connection with the correction of a CAS violation.  Here, the alleged "windfall" occurs because GE is complying with the CAS. GE's continued and proper use of PAYG accounting for PRBs does not trigger the

---

[25]This case stands in marked contrast to cases where the government has experienced a true cost reduction.  In those cases, as a result of a segment-seller's transfer of pension assets to the buyer, the government's payment of future pension costs was reduced (i.e., the transferred assets are used to reduce a pension deficit for which the government would otherwise have been obligated to pay).  Here the government's payment obligation, which was based on PAYG accounting, remains the same.  The amount the government will reimburse GE for PRB costs will vary depending upon the ratio of government to private contracts.  The government's obligation both before and after the segment closings remains the same.

"windfall" provision.[26]

**CONCLUSION**

For all of the above-stated reasons, the government's motion for partial summary judgment is **GRANTED**.  GE's motion for partial summary judgment is **DENIED**.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[26]For all of these same reasons, GE is not entitled to an "offset" under the common law of damages.  Because the government has not benefitted from GE's decisions regarding the sales of the GEA and MAO segments, there is nothing to "offset."