# In the United States Court of Federal Claims

No. 99-172C
(Filed: July 23, 2013)
**\*Opinion originally filed under seal on July 18, 2013\***

| | |
|---|---|
| GENERAL ELECTRIC COMPANY, | **Original Cost Accounting Standards ("CAS") segment closing adjustment obligation; CAS 413.50(c)(12); CAS 413.50(c)(5)(i) and (ii) asset allocation; calculation of <u>Teledyne</u> share; "measurable benefit" for future periods under <u>DIRECTV Group, Inc. v. United States</u>, 670 F.3d 1370 (Fed. Cir. 2012)** |
| Plaintiff, | |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |

*Richard D. Bernstein*, Washington, DC, for plaintiff.  *Mei Lin Kwan-Gett* and *Howard Stanislawski*, Washington, DC and *Alan C. Brown*, McLean, VA, of counsel.

*C. Coleman Bird*, Civil Division, United States Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Kirk T. Manhardt*, Assistant Director, for defendant. *Stephen R. Dooley*, Defense Contract Management Agency, Boston, MA, of counsel.

## OPINION

**FIRESTONE**, *Judge*.

Pending before the court are the parties' cross-motions for partial summary

judgment regarding the plaintiff General Electric Company's ("GE") segment closing

adjustment obligation under Cost Accounting Standard ("CAS") 413.50(c)(12), 4 C.F.R.

§ 413.50(c)(12) (1978),[1] associated with the 1993 sale of two GE business segments, GE

---

[1] The segment closing at issue in this case predates the 1995 revisions to the CAS and as such is governed by the original version of CAS 413, which was promulgated in 1977 and became

Aerospace ("GEA") and GE Machinery Apparatus Operation ("MAO"), to Martin

Marietta Corporation ("MMC") and Westinghouse Electric Corporation

("Westinghouse"), respectively.  This is the sixth decision in this case.[2]  At issue in the

parties' motions is whether GE has properly calculated certain aspects of the segment

closing adjustment required by Section 413 of the CAS ("CAS 413").  For the reasons

that follow, GE's motion for partial summary judgment is **GRANTED-IN-PART** and

**DENIED-IN-PART**, and the government's cross-motion for partial summary judgment

is **GRANTED-IN-PART** and **DENIED-IN-PART**.

## I.   BACKGROUND

This case involves the closing of two GE segments, the GEA and MAO segments.

The facts regarding the closing of these segments are discussed in detail in the court's

prior decisions.  The following basic facts, relevant to the court's decision here, are not

disputed.

Since the early 1900s, GE has maintained a pension plan for its employees known

as the GE Pension Plan ("GEPP").  Pl.'s Proposed Findings of Uncontroverted Fact

("Pl.'s PFUF") ¶ 1, ECF No. 585.  The GEPP is a defined benefit plan that provides,

upon retirement, payments to GE's employees and their beneficiaries.  Gen. Elec. Co. v.

United States ("GE"), 84 Fed. Cl. 129, 132 (2008).  A large portion of GE's business has

---

effective in 1978.  See Gen. Elec. Co. v. United States, 84 Fed. Cl. 129, 131 n.2 (2008).
References in this opinion to "CAS 413" are to the original CAS 413 unless otherwise noted.

[2] See Gen. Elec. Co. v. United States, 92 Fed. Cl. 798, 801 n.3 (2010) (a summary of prior
decisions).

historically consisted of contracts with the government, and the government has reimbursed GE for pension costs attributable to GE employees working on government contracts. Id. The market value of assets in the GEPP has exceeded the actuarially-calculated liabilities of the GEPP, resulting in a pension surplus, since 1987. Id.; Pl.'s PFUF ¶ 11.

GE accounted for its pension assets and liabilities at the plan level, as opposed to on a segment-by-segment basis. See Pl.'s PFUF ¶ 7. This type of accounting is called "composite accounting." See id. To recover its pension costs, GE computed its pension costs for the GEPP as a whole. See id. Then, GE allocated a portion of the total GEPP pension costs to the GEA and MAO segments.[3] Id. ¶ 9. Finally, GE recovered a portion of the GEA and MAO pension costs per the terms of the applicable government contracts. Allegheny Teledyne Inc. v. United States, 316 F.3d 1366, 1371 (Fed. Cir. 2003).

The GEPP was created in 1912, and subsequently amended in 1946. Pl.'s PFUF ¶¶ 1, 4. From September 1946 until the 1993 segment closing dates, GE employees have been required to make contributions to participate in the GEPP. Id. ¶ 20. The features of the employee contributions were amended as of January 1, 1989 and again in 1991, to permit voluntary contributions. Id. ¶ 21. GE employee contributions, like other assets in

---

[3] The segments at issue here are comprised of smaller accounting groups called pension units. There is an apparent dispute as to the nature of the relationship between segments and pension units for the purpose of asset allocation under CAS 413 in this case. Def.'s Reply at 8 n.3, ECF No. 606. However, none of the court's holdings in this case turn on this dispute. As discussed infra, the court leaves questions concerning the appropriateness of the methodology GE used to make its asset allocation calculations under CAS 413.50(c)(5)(i) to be resolved at trial.

the GEPP, have been invested in stocks, bonds, and other investment assets, with GE

bearing the risk or benefit that GEPP investment returns could be different than the rates

required to be credited to participants in the GEPP, pursuant to the terms of the plan.  Id.

¶ 22.  It is undisputed that employee contributions from 1989 through 1993 earned an

annual average return that exceeded the interest rate credited to those contributions by

2.2% on an annually compounded basis.  Id.

In 1993, GE transferred the GEA and MAO segments to MMC and Westinghouse,

along with the assets and liabilities of the GEPP associated with the GEA and MAO

employees that were transferred.  Id. ¶ 24.  GE also transferred to MMC pension assets

that had a market value of $254,630,143 in excess of the transferred GEA actuarial

liabilities and GE transferred to Westinghouse pension assets that had a market value of

$7,937,371 in excess of the transferred MAO actuarial liabilities, as calculated by GE.

Id. ¶ 25.  The GEA and MAO segments and their pension plans have subsequently been

transferred to other successor contractors.  See id. ¶ 53.

### A.    Segment closing adjustment under the CAS.

The sale of GEA and MAO triggered GE's obligation to perform a segment

closing adjustment calculation under the CAS.  The CAS were promulgated to provide

uniformity in how contractors measure and allocate costs to government contracts.  Gates

v. Raytheon Co., 584 F.3d 1062, 1064 (Fed. Cir. 2009); Allegheny Teledyne, 316 F.3d at

1370.  CAS 412 governs how a contractor determines its pension costs for each period

using actuarial estimates of the pension plan's anticipated earnings and benefit payments.

Allegheny Teledyne, 316 F.3d at 1371.  The contractor first determines its pension costs

as a whole, then allocates those costs among its segments, then further allocates them among its contracts.  Id.  The pension costs allocated to certain government contracts are paid by the government according to the Federal Acquisition Regulations ("FAR") and the terms of the particular contracts.  Id.

The CAS allow for adjustments to a contractor's pension costs in certain circumstances in order to prevent volatility in the amounts of pension costs charged to the government.  DIRECTV Grp., Inc. v. United States, 670 F.3d 1370, 1372-73 (Fed. Cir. 2012).  Under CAS 413, the actuarial gains or losses of a pension plan, which represent differences between the estimates and the actual experience of the pension plan, are amortized in equal annual installments over a fifteen-year period.  Id.; CAS 413.50(a).  This adjustment process is interrupted, however, when a business segment is closed— "i.e., whenever the segment's contracts have become separated or closed off from the pension costs such that there are no future periods in which to adjust . . . [the] pension costs."  DIRECTV, 670 F.3d at 1373 (internal quotation omitted).  In that case, CAS 413.50(c)(12) provides for adjustments to pension costs to account for a closed segment's pension surplus or deficit.  Id.; Allegheny Teledyne, 316 F.3d at 1371.

Specifically, when a segment closing occurs, CAS 413 provides that a contractor must calculate the difference between the market value of the assets in the pension plan allocated to the segment and the actuarial liability for the segment, to determine the amount by which the plan is over- or under-funded:

> If a segment is closed, the contractor shall determine the difference between
> the actuarial liability for the segment and the market value of the assets
> allocated to the segment, irrespective of whether or not the pension plan is

terminated. . . . The calculation of the difference between the market value of the assets and the actuarial liability shall be made as of the date of the event (e.g., contract termination) that caused the closing of the segment. . . . The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs.

CAS 413.50(c)(12); see Allegheny Teledyne, 316 F.3d at 1371; GE, 84 Fed. Cl. at 132-33.  If the difference is positive, the government may be entitled to the share of this surplus from the contractor.  See Raytheon Co. v. United States, 105 Fed. Cl. 236, 239-40 (2012).  If the difference is negative, the contractor may be entitled to a share of the deficit from the government.  See id.  "In short, [when a segment closes,] the Government and contractor terminate the amortization and adjust the outstanding pension obligations by allocating any then-existing surplus or deficiency between them."  DIRECTV, 670 F.3d at 1373.  It is undisputed that, in this case, the calculation of the segment closing adjustment yields a surplus that must be allocated between the government and GE.

**B.    Segment closing adjustment obligation calculation.**

Under the CAS and the precedents of the Federal Circuit, the calculation of a segment closing adjustment payment involves three major steps.  First, as noted above, the contractor must determine the difference between the market value of the assets and the actuarial liability in the relevant pension plan as of the date of the segment closing, as provided for in CAS 413.50(c)(12).  CAS 413.50(c)(12) provides that when a segment using composite accounting closes, a contractor must use the methods in CAS

413.50(c)(5) to allocate a portion of the market value of the composite pension plan's assets to the closed segment.

CAS 413.50(c)(5) provides two alternative methods for doing so. Section (c)(5)(i) provides for an allocation of the market value of pension plan assets based on "the amount of funds contributed by, or on behalf of, the segment, increased by income received on such funds, and decreased by benefits and expenses paid from such funds." The method in Section (c)(5)(i) is used if the "necessary data [as prescribed by Section (c)(5)(i)] are readily determinable." Id. However, if the "necessary data" are not "readily determinable," then the contractor may use the approach set forth in Section (c)(5)(ii). The (c)(5)(ii) method requires the allocation of assets to segments "in a manner consistent with the actuarial cost method or methods used to compute pension cost." CAS 413.50(c)(5)(ii).

After calculating the CAS 413 pension surplus or deficit, the contractor must determine the share of the pension surplus or deficit attributable to the government. See DIRECTV, 670 F.3d at 1373. This share is referred to as the "Teledyne share." GE, 84 Fed. Cl. at 137. The Teledyne share represents the portion of the CAS 413 segment closing surplus recoverable by the government, and is meant to capture "the costs actually paid by the government." Allegheny Teledyne, 316 F.3d at 1381. In 2004, the Defense Contract Management Agency ("DCMA") and the Defense Contract Audit Agency ("DCAA") issued a Joint Guidance regarding CAS 413 segment closing adjustments based on the ruling of the United States Court of Federal Claims in Teledyne, Inc. v. United States, 50 Fed. Cl. 155 (2001), as affirmed by the Federal Circuit

7

in Allegheny Teledyne Inc. v. United States, 316 F.3d 1366 (Fed. Cir. 2003) (collectively

referred to as the "Teledyne decisions"). Pl.'s Mot., Ex. 2 ("Joint Guidance"). Both

parties rely on the Joint Guidance to calculate the Teledyne share. Under the Teledyne

decisions, the government may not recover pension surplus assets derived from contracts

that predate CAS 413, pre-1995 firm-fixed price government contracts, or employee

contributions to pension plans. See Teledyne, Inc., 50 Fed. Cl. at 191. The Teledyne

share is calculated as a fraction that incorporates these principles. The numerator of this

fraction equals pension costs allocated to flexibly-priced contracts that provide for CAS

413. Joint Guidance, Att. at 1. The denominator of the Teledyne fraction equals the total

pension contributions from all sources since the date of the pension plan's inception. Id.

The product of the pension surplus assets calculated under CAS 413 and the

Teledyne share is the amount of pension surplus owed by a contractor to the government.

This product is referred to as a contractor's segment closing adjustment obligation

("SCAO"). The government may recover the SCAO through the FAR, and in particular,

the Allowable Cost and Payment Clause, 48 C.F.R. § 52.216-7(h)(2), and the Credits

Clause, 48 C.F.R. § 31.201-5. Teledyne, Inc., 50 Fed. Cl. at 182.[4]

---

[4] In Teledyne, Inc., the court explained:

> Because the court concludes that the CAS 413 segment closing adjustment allows
> for recovery in the current period at the time of the segment closing, the terms of
> the Allowable Cost and Payment and Credits clauses will govern. "As a general
> proposition, . . . cost principles are concerned with assuring that if the
> Government pays a cost and later that cost is reduced, by whatever means, the
> Government receives the benefit of that reduction." Under the Allowable Cost
> and Payment clause, if the CAS 413 calculation shows a surplus, the contractor
> will be required to "pay to the Government any refunds, rebates, credits, or other
> amounts . . . accruing to or received by the Contractor . . . to the extent that [those

Third, in connection with recovering the SCAO, the "measurable benefit" that the government received because of an acknowledged surplus of pension assets transferred from the seller of a segment to the buyer of a segment must be taken into account. GE, 84 Fed. Cl. at 152; see also DIRECTV, 670 F.3d at 1377-79. Determining the amount of "measurable benefit" is also governed by looking to the Allowable Cost and Payment Clause and the Credits Clause. DIRECTV, 670 F.3d at 1376-77. In this case, as noted above, GE transferred, with the government's understanding, approximately $260 million in surplus assets to MMC and Westinghouse incident to the sale of GEA and MAO, and may offset its SCAO by the benefit the government derived from this transfer.[5]  See id. at 1379.

The government and GE have cross-moved for partial summary judgment as to the consistency of certain aspects of their respective segment closing calculations with the requirements of the CAS and the FAR. The parties' specific disagreements arise under all three aspects of the segment closing adjustment calculation—the valuation of the

---

amounts] are properly allocable to costs for which the Contractor has been reimbursed by the Government." 48 C.F.R. § 52.216-7(h)(2). The provision is then implemented through the Credits clause, which states that, "The applicable portion of any income, rebate, allowance, or other credit relating to any allowable cost and received by or accruing to the contractor shall be credited to the Government either as a cost reduction or by cash refund." Id. § 31.201-5.

50 Fed. Cl. at 182 (some internal citations omitted).

[5] The government argues that, in its view, the "measurable benefit" is not a proper cost reduction under the Credits Clause. Def.'s Cross-Mot. at 28-30, ECF No. 594. The court concludes, infra, that this argument is foreclosed by the Federal Circuit's holding in DIRECTV, as the government acknowledges. Def.'s Cross-Mot. at 29 ("We recognize that . . . the Court may regard our arguments on this point set out below as foreclosed by [DIRECTV].").

surplus that results from the segment closing adjustment under CAS 413.50(c)(12), the

Teledyne share calculation, and the value of the "measurable benefit" derived by the

government due to the surplus pension transfer from GE to MMC and Westinghouse.

Briefing on the parties' arguments was completed on January 4, 2013.  Oral argument

was held from April 8, 2013 to April 16, 2013.[6]  The court now turns to the parties'

arguments.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only if "there is no genuine dispute as to any

material fact and the movant is entitled to a judgment as a matter of law."  Rule 56(a) of

the Rules of the United States Court of Federal Claims ("RCFC"); see also Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247-49 (1986); Casitas Mun. Water Dist. v. United

States, 543 F.3d 1276, 1283 (Fed. Cir. 2008).  A material fact is one that "might affect

the outcome of the suit under the governing law," and an issue is genuine "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson,

477 U.S. at 248.  In considering the existence of a genuine issue of material fact, a court

must draw all inferences in the light most favorable to the non-moving party.  Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

---

[6] At oral argument, both parties' experts were heard as to their positions regarding each party's segment closing valuation.  Expert presentations were exchanged by the parties in advance, cross-examination was not permitted, and each expert was forbidden from presenting any new opinion or calculation outside of their expert reports and depositions.  As such, the experts' testimony acted as a "living affidavit," and was solely used to provide the court with a better understanding of the many calculations performed in this case.

Once the movant has shown that no genuine issue of material fact exists, the party opposing summary judgment must demonstrate that such an issue, in fact, does exist. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). To establish a genuine issue of material fact, a party "must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient." Radar Indus., Inc. v. Cleveland Die & Mfg. Co., 424 F. App'x 931, 936 (Fed. Cir. 2011) (quoting SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1116 (Fed. Cir. 1985)) (internal quotation omitted). A party asserting that a fact is genuinely disputed must support its assertions with actual evidence. Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir. 2007); Matsushita Elec. Indus., 475 U.S. at 587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." (internal quotation omitted)). Where there is doubt as to the existence of a genuine issue of material fact, that doubt must be resolved in favor of the non-movant. Unigene Labs., Inc. v. Apotex, Inc., 655 F.3d 1352, 1360 (Fed. Cir. 2011) (citing Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc., 520 F.3d 1358, 1360-61 (Fed. Cir. 2008)). With respect to cross-motions for summary judgment, each motion is evaluated on its own merits and reasonable inferences are resolved against the party whose motion is being considered. Marriot Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968-69 (Fed. Cir. 2009).

Summary judgment is particularly appropriate where the issue decided fundamentally concerns questions of law. Huskey v. Trujillo, 302 F.3d 1307, 1310 (Fed. Cir. 2002) (citing Dana Corp. v. United States, 174 F.3d 1344, 1347 (Fed. Cir. 1999)

("Summary judgment was appropriate here because no material facts were disputed, many being stipulated, and the only disputed issues were issues of law.")).  In making legal interpretations of the provisions and requirements of the CAS, the court looks to any guidance the CAS Board ("CASB") has published.  See Perry v. Martin Marietta Corp., 47 F.3d 1134, 1137 (Fed. Cir. 1995).  In addition, the court will read the subject CAS section "together with the other provisions of the regulation" in order to ensure that the court construes the CAS provision in context.  Gen. Elec. Co. v. United States, 92 Fed. Cl. 798, 812 (2010).  Finally, to the extent the CAS requirements are not clear from the face of the regulation or available CASB guidance, the court will consider how various actuarial terms found in CAS 413 are used in practice to guide its legal interpretation of the CAS.  Raytheon, 105 Fed. Cl. at 271.

## III.   DISCUSSION

As discussed in more detail below, GE moves for partial summary judgment in this case regarding four issues.  First, GE argues that the government cannot claim a pension surplus from the MAO segment closing because the government's own calculations show that the "measurable benefit" it received from the transfer of pension surplus assets from GE to Westinghouse exceeds its calculation of the SCAO due to the government.  Second, GE moves for summary judgment that, if its segment closing asset allocation to GEA must be governed by CAS 413.50(c)(5)(ii), the asset allocation should begin in 1988 at the latest and "roll forward" to the segment closing date, rather than be calculated as of the segment closing date.  Third, GE argues that it is entitled to summary judgment that certain pre-1946 GE contributions and post-1988 employee contributions

12

to the GEPP should be included in the <u>Teledyne</u> share denominator.  Finally, GE moves for summary judgment that the part of its "measurable benefit" calculation based on the projection of future cost savings derived by the government must, as a matter of law, be greater than zero.[7]

The government opposes GE's motion for summary judgment, arguing that there are disputed issues of fact that must be resolved before entering summary judgment in favor of GE, or that GE's interpretation of the CAS and the FAR is wrong as a matter of law.  In addition, the government cross-moves for summary judgment that the allocation of the GEPP's pension assets to GEA and MAO must be made pursuant to CAS 413.50(c)(5)(ii), rather than CAS 413.50(c)(5)(i).  Specifically, the government argues that the "necessary data" required by Section (c)(5)(i) are not "readily determinable" from the start of the segment at issue, and that, therefore, GE may not use Section (c)(5)(i) to allocate assets to its segments.  The government also moves for a determination that, under CAS 413.50(c)(5)(ii), an allocation of the market value of GEPP assets to GEA must be made as of the date of the segment closing and no earlier.

The court discusses these issues in turn.

### A.    The government's counterclaim regarding the MAO segment must be dismissed under the precedent of <u>DIRECTV</u>.

First, GE asks the court to dismiss the government's counterclaim regarding the MAO segment because, according to the government's own calculations, the "measurable benefit" from the transferred pension surplus to Westinghouse exceeds the government's

---

[7] GE does not move for summary judgment for a specific dollar amount, only that the amount is greater than zero dollars.

calculation of the SCAO.  The government does not dispute that its "measurable benefit" amount exceeds its SCAO calculation.  However, the government argues that the court should wait to dismiss the MAO counterclaim, in the interest of judicial economy and efficiency, because GE has asserted that it is entitled to a credit for any excess "measurable benefit" that it transferred to Westinghouse.  Def.'s Cross-Mot. at 28.  The government also argues that the cost savings realized by the government because of the transferred pension surplus are not proper cost reductions under the Credits Clause because they are calculated based on a hypothetical "but-for" world.  Id. at 29-30.  However, as acknowledged by the government, this latter argument is foreclosed by the Federal Circuit's decision in DIRECTV Group, Inc. v. United States, 670 F.3d 1370, 1379 (2012), which held that a contractor's "segment closing obligations could be satisfied by the cost savings realized by the Government in the successor contracts" due to the transfer of pension surplus.[8]  In addition, the court sees no reason to delay the dismissal of the government's counterclaim for the MAO segment.  For these reasons, GE's motion to dismiss the government's counterclaim regarding the MAO segment is granted.

## B.    Asset allocation.

The court now turns to the parties' disputes regarding the CAS 413.50(c)(5) asset allocation.  The court will first address in Part III.B.1 the government's cross-motion, which argues for summary judgment that the only asset allocation method that CAS

---

[8] As noted, the parties dispute whether projected future cost reductions may be credited against GE's SCAO.  The court addresses this dispute in Part III.D, infra.

413.50(c)(5) permits based on the undisputed facts in this case is the allocation method set forth in Section (c)(5)(ii).  The government's cross-motion in this regard seeks to bar two alternative asset allocation calculations made by GE under Section (c)(5)(i), one beginning in 1979, the effective date of the CAS, and the other beginning in 1952, the inception of the GEA segment.  The court will then address in Part III.B.2 GE's motion for summary judgment that, if the asset allocation method in Section (c)(5)(ii) applies in this case, any (c)(5)(ii) asset allocation must begin no later than 1988, the first date that actuarial liability data is available for the GEA segment.  The government opposes GE's motion, and argues that a (c)(5)(ii) asset allocation must be made as of 1993, the date of the segment closing, rather than any earlier date.

<blockquote>

**1.      GE's 1979-starting asset allocation does not comply with the requirements of Section (c)(5)(i), but questions of fact remain as to whether GE's 1952-starting asset allocation is based on permissible "readily determinable" data under the CAS.**

</blockquote>

As noted above, to calculate whether there is a pension surplus or deficit upon the closing of a segment, CAS 413.50(c)(12) requires a contractor to calculate the difference between the market value of the assets in a closed segment's pension plan and the actuarial liability associated with the segment.  In order to calculate the market value of the assets in a closed segment covered by a composite pension plan, a contractor must allocate a portion of the assets in the pension plan to the closed segment.  This asset allocation is governed by CAS 413.50(c)(5)(i) and (ii).  As a threshold matter, the government moves for summary judgment that the asset allocation method prescribed by

CAS 413.50(c)(5)(ii), rather than that prescribed by Section (c)(5)(i), must be used in this case to allocate assets to GEA.[9]  CAS 413.50(c)(5) provides in relevant part:

> [T]here shall be an initial allocation of a share in the undivided pension fund assets to [a] segment, as follows: (i) If the necessary data are readily determinable, the amount of assets to be allocated to the segment shall be the amount of funds contributed by, or on behalf of the segment, increased by income received on such funds, and decreased by benefits and expenses paid from such funds; (ii) if the data specified in subdivision (i) of this paragraph are not readily determinable, the actuarial value of the pension fund's assets shall be allocated to the segment in a matter consistent with the actuarial cost method or methods used to compute pension costs.

As indicated by the language of this provision, under Section (c)(5)(i), a contractor must use the "necessary data"—"the amount of funds contributed by . . . the segment," the "income received on such funds," and the "benefits and expenses paid from such funds"—to allocate assets to a segment, if those data are "readily determinable."  The parties' dispute regarding Section (c)(5)(i) involves two issues—(1) when a (c)(5)(i) asset allocation must begin, and (2) whether the term "readily determinable" permits the use of estimates of the "necessary data" provided for in Section (c)(5)(i).

> a.    GE's asset allocation and "roll forward" calculations under Section (c)(5)(i).

GE proposes two alternate asset allocation calculations that it argues comply with the requirements of CAS 413.50(c)(5)(i).  Both calculations allocate cumulative GEPP assets to GEA based on certain allocation bases, and then "roll forward" to determine a

---

[9] GE's expert also calculated the SCAO under the CAS for the MAO segment.  However, because the government's counterclaim regarding the MAO segment must be dismissed, the court discusses only the GEA segment here.

final asset value at segment closing using contributions, income, benefits, and expenses
data for GEA.

The first of GE's (c)(5)(i) calculations allocates total GEPP assets to the GEA
segment beginning in 1979, the effective date of the CAS.  This initial allocation was
performed in two steps.  First, total GEPP assets as of January 1, 1979 were divided into
two categories—"active and terminated vested" employees ("actives") and "retirees"—
based on each group's percentage share of total plan actuarial liability.  Def.'s Proposed
Findings of Uncontroverted Fact ("Def.'s PFUF") ¶ 3, ECF No. 594-1.  The actives'
assets were then allocated to the GEA segment by applying GEA's share of the actives'
accrued benefits in the plan based on data maintained by GE.  Id.  The GEPP's retiree
assets were then allocated to GEA based on GEA's share of "annual benefits in pay," also
based on data maintained by GE for retirees.  Id. ¶ 4.  The total assets for GEA were
calculated as the sum of its respective active and retiree asset allocations.  Id. ¶ 5.

After cumulative GEPP assets were initially allocated to GEA as of 1979, GE's
expert adjusted the initial asset allocation to the segment closing date by performing a
"roll forward" calculation.  See id. ¶ 20.  This calculation used employee and GE
company contributions made on behalf of the segment, transfers of employees in and out
of the segment, benefit payments, refunds of employee contributions, and investment
returns and expenses to determine GEA assets as of the segment closing date.  Expert
Rebuttal Report of John B. McQuade at II-8 to 9.

Several of the "roll forward" data starting from 1979 were not available and had to
be calculated based on other available data and historical documents.  For example, GE

company contributions for GEA were calculated by allocating total company contributions to segments in proportion to benefits accrued data for those segments.  Id. at II-8.  Benefit payments from 1979 through 1984 were estimated for certain individuals by assuming that those individuals had similar experiences and mortality under the pension plan as those for whom data was available.[10]  Expert Report of John B. McQuade at II-9; Expert Rebuttal Report of John B. McQuade at IV-11.  The missing benefit payments data were apparently available on microfiche for GEA at the individual level, but GE's expert elected not to review all of the data on the grounds that it would be too costly or unnecessarily burdensome to acquire.  See Tr. 190 (Mr. McQuade).  Missing data on assets associated with transferred employees were also estimated by applying GEPP-wide actuarial factors.[11]  Expert Report of John B. McQuade at II-10.  While GE argues that these estimates were based on historical records, contemporaneous records documenting actual company contributions to segments, certain benefit payments, and transfers were either not available or not used by GE in its 1979-starting (c)(5)(i) calculation.

GE's second (c)(5)(i) calculation allocates GEPP assets to the GEA segment beginning in January 1, 1952, when the businesses that eventually comprised GEA were

---

[10] These estimates were also used to make the retiree initial asset allocation.  See Tr. 190-93 (Mr. McQuade).

[11] GE disputes that it was required to estimate transfers in and out, and that therefore, the fact that this data was estimated is immaterial to the parties' dispute.  Expert Report of John B. McQuade at II-10 (citing CAS 413.50(c)(8) ("[C]ontractors need not transfer assets or liabilities unless a transfer is sufficiently large to distort the segments' ratio of fund assets to actuarial liabilities.")).  This dispute need not be now resolved to resolve the larger issue regarding GE's use of Section (c)(5)(i).

18

first organized in a manner that resembled a "segment" under CAS 413.  Expert Report of

John B. McQuade at III-10.  GE's expert used the same method to initially allocate assets

to GEA in 1952 as he did for the 1979-starting allocation.  Id. at III-25.  First, GE's

expert separated GEPP assets at the plan level between GEPP actives and retirees.  Id.

To do so, GE's expert had to estimate actuarial liabilities as of January 1, 1952, because

no record of actuarial liabilities separating actives from retirees was available as of this

date.  Id.  In particular, to calculate the actuarial liabilities as of January 1, 1952, GE's

expert used actuarial factors that were used by GE in 1957, the first year in which GEPP

actuarial liability information was provided for actives and retirees separately.  Id.  In

addition, actives' liability was initially allocated to the GEA segment based, in part, on

fitting an exponential growth curve between certain annuity data points between 1946

and 1965 and later years through 1978.  Id. at III-29 to 30.

Estimates of "necessary data" were also made to perform the "roll forward"

calculation for the 1952-starting asset allocation.  For example, GE company

contributions allocated to the GEA segment were calculated for the years 1952 to 1978 in

proportion to compensation (for 1952 to 1969) and benefits accrued (for 1970 to 1978).

Id. at III-35 to 37.  Compensation data for GEA or the GEPP in total were not available

before 1965, and were estimated using a proportion capturing the relationship between

compensation and employee contributions for the 1965 to 1978 period, and applying that

proportion to earlier years.  Id. at III-35.

Some benefit payments were also estimated for certain employees between 1952

and 1978, based on a data tape that reflected the amounts of benefits paid each year from

1952 to 1978 for participants who were still alive in 1982.  Id. at III-42 to 43.  Benefit

payments for 1952 through 1978 were estimated for about 73,000 employees by applying

historical plan provisions to "reverse engineer" benefit payments back to a date of

retirement.  Id.; Tr. 243 (Mr. McQuade).  Employee contributions were also estimated for

certain years because data were only available for "continuing active" employees, not

those terminated in a certain year.  Tr. 240 (Mr. McQuade); Expert Report of John B.

McQuade at III-31 to 33 (using a proportion derived from data from 1952-1955, 1965,

and 1967-1978 to calculate GEPP gross employee contributions for "ongoing actives" for

1956 through 1964 and 1966, a factor then used to allocate gross employee contributions

to segments).  GE used these estimates to "roll forward" its initial 1952 asset allocation to

the segment closing date.

> **b.**    **GE's 1979-starting (c)(5)(i) asset allocation does not comply with the CAS because an asset allocation under Section (c)(5)(i) must begin at the inception of the segment at issue.**

The court turns first to the parties' dispute over when a (c)(5)(i) asset allocation

must begin.  The government argues that a (c)(5)(i) asset allocation must begin at the

inception of the segment in question, and then "roll forward" to the segment closing date.

The government contends that GE's 1979-based asset allocation is thus impermissible

under CAS 413.50(c)(5)(i) because it ignores years of "necessary data" for the GEA

segment, which both parties agree began sometime in 1951.  GE argues in response that

nothing in the CAS precludes a contractor from beginning a (c)(5)(i) asset allocation in

1979, the effective date of the CAS.  For the reasons discussed below, the court finds that the government is entitled to summary judgment on this issue.

It is well-settled that the court's interpretation of the CAS is a question of law that may be resolved on summary judgment.  See Gen. Elec. Co. v. United States, 92 Fed. Cl. 798, 804 n.13 (2010).  When interpreting provisions of the CAS, the court must ascertain the CASB's intended meaning when it promulgated the CAS by "looking at the text of the relevant provisions and any guidance that the [CASB] has published to aid in interpretation."  Allegheny Teledyne, 316 F.3d at 1373 (internal quotation omitted).  The court thus looks to the plain language, structure, and legislative history of the CAS to determine its meaning.  Gen. Motors Corp. v. United States, 78 Fed. Cl. 336, 343 (2007).

Contrary to GE's contention, nothing in Section (c)(5) specifies that a contractor may perform a calculation under Section (c)(5)(i) if it possesses the necessary "readily determinable" data beginning in 1979, the effective date of the CAS.  Rather, the plain language of Section (c)(5)(i) indicates that the "necessary data," such as the contributions and the benefits paid from the pension fund, must be "readily determinable" for the "segment" at issue:

> [T]here shall be an initial allocation of a share in the undivided pension fund assets to [a] segment, as follows: (i) If the necessary data are readily determinable, the amount of assets to be allocated to the segment shall be the amount of funds contributed by, or on behalf of the segment, increased by income received on such funds, and decreased by benefits and expenses paid from such funds . . . .

CAS 413.50(c)(5)(i) (emphasis added).  Based on the plain language of Section (c)(5)(i), the court therefore concludes that an asset allocation under Section (c)(5)(i) must include

the "necessary data" for all prior periods of the segment in question.  For the GEA

segment, therefore, a (c)(5)(i) asset allocation must begin in 1952, and "roll forward"

using the "necessary data" specified by Section (c)(5)(i).

The court finds that GE's contention that such an interpretation is "impermissibly

retroactive" is misplaced.  Pl.'s Reply at 11, ECF No. 598.  Nothing in Section (c)(5)

improperly requires that a contractor maintain any of the "necessary data" before or after

1979 in order to allocate assets to segments while at the same time punishing a contractor

for not doing so in the past.  Rather, the CAS provide that if the contractor has the

"necessary data" that are "readily determinable" for the lifespan of the "segment," it must

use those data in a (c)(5)(i) asset allocation.  If those data are lacking, it must use the

(c)(5)(ii) allocation.  Neither asset allocation penalizes the contractor for failing to

maintain data before the effective date of the CAS, but rather provides two alternative

methods for allocating assets based on the nature of the data available.[12]  The court thus

---

[12] Regulations may be disfavored as retroactive when their application "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."  Landgraf v. USI Film Prods., 511 U.S. 244, 280 (1994).  In this regard, the cases relied on by GE are inapposite because the regulations at issue in those cases improperly prejudiced or imposed new duties on the regulated parties.  Princess Cruises, Inc. v. United States, 397 F.3d 1358, 1366-67 (Fed. Cir. 2006) (finding an evidentiary presumption connected to the non-collection of data in years prior to the promulgation of the presumption impermissibly retroactive because it effected a change in law that prejudiced regulated parties); Univ. of Iowa Hosps. and Clinics v. Shalala, 180 F.3d 943, 952 (8th Cir. 1999) (rejecting a documentation standard as impermissibly retroactive because it improperly penalized regulated parties "for not meeting a documentation requirement five years before the enactment of that requirement").  As explained above, the fact that a contractor may only use Section (c)(5)(i) if it maintains necessary records from the start of the segment at issue does not retroactively require a contractor to do so.  If the contractor lacks the "necessary data" from the start of the segment, Section (c)(5)(ii) may be used to allocate assets to segments.

finds that an asset allocation for the GEA segment under Section (c)(5)(i) must begin in 1952, at the start of that segment.

> c.   **The CAS do not place an absolute bar on the use of estimates under Section (c)(5)(i), but questions of fact remain as to whether the estimates used by GE in its 1952-starting asset allocation comply with the CAS.**

The parties next dispute whether the estimates of the "necessary data" used by GE in its 1952-starting asset allocation constitute "readily determinable" data under Section (c)(5)(i).  The government argues that perfect, contemporaneous information on the "necessary data" for the segment must be used to comply with the asset allocation requirements of Section (c)(5)(i).  Otherwise, the government contends, the asset allocation of Section (c)(5)(ii) must be used.  GE argues in response that nothing in the CAS precludes the use of estimates under Section (c)(5)(i).  For the reasons discussed below, the court finds that, as a matter of law, the CAS do not place an absolute bar on the use of estimates of the "necessary data" to allocate assets to segments under Section (c)(5)(i).  However, questions of fact remain as to whether the estimates GE uses in its 1952-starting asset allocation calculation are based on reasonable assumptions grounded in the GEA segment's actual experience in the GEPP as a whole.

As noted above, the court considers the language, structure, and legislative history of the CAS to ascertain their meaning.  <u>Allegheny Teledyne</u>, 316 F.3d at 1373.  Turning first to the text of the regulation, the plain language of Section (c)(5) offers no specific insight into whether estimates qualify as "readily determinable" data under that section. The government argues to the contrary that the plain meaning of the word

23

"determinable," which the government defines as "capable of being determined, definitely ascertained, or decided upon," does not contemplate estimates. Webster's Third New International Dictionary of the English Language at 616 (1981). Yet, even under the government's proffered definition, "necessary data," such as contributions or benefit payments, may be "capable of being determined" by using estimation methods. In this regard, "capable of being determined" conveys a broader meaning than previously determined, perfect information that the government advocates must be used under Section (c)(5)(i).

The government's demand for absolutely perfect information mandates that any gap in data would bar the use of the (c)(5)(i) asset allocation method, regardless of how small the gap. This result is contrary to the CASB's clear intent that the (c)(5)(i) method is the preferred method under the CAS. As the CASB noted, an asset allocation using a blanket allocation base under Section (c)(5)(ii) "is permitted only when contributions, disbursements, income, and expenditures made by, or on behalf of, a segment are not readily determinable." Cost Accounting Standards for Adjustment and Allocation of Pension Cost, Preamble ("CAS 413 Preamble") § 9, 42 Fed. Reg. 37,191, 37,194 (July 20, 1977) (emphasis added). This stated preference for the (c)(5)(i) asset allocation method is undermined where any small gap in the recorded "necessary data" renders the (c)(5)(i) method inapplicable. Under the government's view a single piece of missing data would be enough to require the application of Section (c)(5)(ii). Given the CASB's expressed preference, the court finds that the government's argument goes too far and

that estimates may constitute "readily determinable" data under CAS 413.50(c)(5)(i) in appropriate circumstances.

The court also finds that this clear regulatory intent is not overcome by the government's arguments based on the structure and legislative history of the CAS to the effect that the CASB intended that the "necessary data" must be "definitely ascertained." In particular, the government argues that the CASB expressly indicated that "summary estimates" may be used under CAS provisions that govern the use of segment-based accounting,[13] but was silent as to their use for asset allocation under Section (c)(5)(i). CAS 413 Preamble § 7, 42 Fed. Reg. at 37,194. The government asks the court to adopt a negative inference based on this silence in regard to the use of estimates under Section (c)(5)(i). However, the court cannot interpret the CASB's failure to directly address the use of estimates under Section (c)(5)(i) to preclude any estimates of "necessary data" under that section, based only on the CASB's allowance of "summary estimates" for a different purpose under the CAS. For this same reason, the court cannot accept the government's contention that the use of the similar phrase "readily determined," in connection with the "date" of the segment closing in CAS 413.50(c)(12) suggests that "readily determinable" "necessary data" under Section (c)(5)(i) must be limited to previously determined numbers. Regardless of whether estimates may or may not be used under other provisions of the CAS, there remains an absence of any indication as to

---

[13] Specifically, CAS 413.50(c)(2) and (3) provide that a contractor must use segment-based accounting for its pension costs when segment accounting would result in a material difference in the amount of pension cost allocated to segments. The CASB stated that contractors could rely on "summary estimates as a basis for determining whether separate [segment-based] calculations are required." CAS 413 Preamble § 7, 42 Fed. Reg. at 37,194.

whether estimates may be used in appropriate circumstances for the purposes of Section (c)(5)(i).  See Burns v. United States, 501 U.S. 129, 136 (1991) (rejecting an inference drawn from congressional silence when it is contrary to evidence of congressional intent), abrogated on other grounds as recognized by Irizarry v. United States, 553 U.S. 708 (2008).

Finally, contrary to the government's contention, the court's interpretation will not render Section (c)(5)(ii) a nullity because a contractor will always be able to produce an "estimate" of any "necessary data."  As GE readily concedes, Section (c)(5)(i) does not permit the use of any type of estimate.  Rather, as this court held in Raytheon Co. v. United States, 105 Fed. Cl. 236, 295 (2012), "CAS 413-50(c)(5)(i) is the preferred method for attributing pension assets to a segment only where there is sufficient 'readily determinable' data available to support reasonable assumptions regarding the segment's contribution to the pension asset base as a whole." (Emphasis added) (discussing the near identical provision in the 1995 version of the CAS).  As such, any estimates of the "necessary data" under Section (c)(5)(i) must employ reasonable assumptions that are historically-based to reflect the "actual experience of the segment in the plan."  Id. at 275. Whether GE's estimated "necessary data" in its 1952-based asset allocation meet these requirements is a fact-based question that cannot be resolved on summary judgment.  The court thus reserves this issue for trial.  If the evidence at trial demonstrates that GE's estimates are not based on reasonable assumptions regarding GEA's actual experience in the GEPP, the court will, as it did in Raytheon, reject the use of the (c)(5)(i) asset allocation method in this case.

2.      **Assuming that Section (c)(5)(ii) must be used to allocate assets in this case, a (c)(5)(ii) asset allocation must be made at the date of the segment closing.**

In the interest of judicial economy, the court now turns to GE's motion for summary judgment regarding the proper date for determining the pension asset allocation under Section (c)(5)(ii), in the event the court determines that GE's (c)(5)(i) allocation does not comport with the CAS.  GE alternatively allocates assets under Section (c)(5)(ii) based on GEA's share of actuarial liabilities in 1988, the first date for which these data are available.  In 1988, GEA's share of actuarial liabilities was approximately 15%. Expert Rebuttal Report of John B. McQuade at IV-62.  Then, using contribution, income, benefit, and expenses data for the GEA segment, GE's expert "rolls forward" the allocated assets to the 1993 segment closing date.

The government argues that the asset allocation under Section (c)(5)(ii) must be performed as of the segment closing date in 1993.  In 1993, GEA's share of the actuarial liabilities of the GEPP was approximately 18% as compared to 15% in 1988, resulting in a higher pension surplus and, in turn, a larger SCAO due to the government.  Expert Rebuttal Report of John B. McQuade at IV-62.  In support of the 1993 asset allocation date, the government contends that the original CAS did not contemplate, as the 1995 CAS allows, an asset allocation as of the "earliest date" when "necessary data" are available.  48 C.F.R. § 9904.413-50(c)(5)(ii).  Rather, the government argues under the structure of the original Sections (c)(5)(i) and (ii) an "either/or" choice is created with regard to when "necessary data" are required, whereas under the new CAS a "hybrid" approach has been adopted to allow for an allocation of assets as of the earliest date when

27

"necessary data" are available, even if the data do not exist from the beginning of the segment.  GE challenges the government's reading of Section (c)(5)(ii) and argues in support of its motion that Section (c)(5)(ii) allows for the use of "prior years'" asset allocation methods.  GE also argues that beginning an allocation as of 1993 will result in a prohibited windfall to the government because it gives the government credit for pension assets that the government did not contribute to the GEPP because the GEPP was fully funded starting in 1988.

After consideration of the parties' arguments, the court holds that an asset allocation under original Section (c)(5)(ii) must take place as of the date of the segment closing.  As noted above, the court must begin its inquiry by analyzing the text and structure of the CAS in order to ascertain the intent of the CASB as to the meaning of the regulation at issue.  <u>Allegheny Teledyne</u>, 316 F.3d at 1373.  The government willingly concedes that if this case fell under the purview of the 1995 revisions to the CAS, GE's 1988-starting calculation would comply with the requirements of Section (c)(5)(ii).  That version of the CAS provides that a (c)(5)(ii) asset allocation may be made "as of the earliest date" that the "necessary data" are available.  48 C.F.R. § 9904.413-50(c)(5)(ii).  However, original CAS 413.50(c)(5)(ii) merely provides that, when the allocation method in Section (c)(5)(i) cannot be used, the assets "shall be allocated to the segment in a manner consistent with the actuarial cost method or methods used to compute pension cost."  In contrast to the revised CAS, this language does not expressly permit a "roll forward" calculation based on data preceding the segment closing date.

It is for this reason that GE's reliance on revised Section (c)(5)(ii) to suggest that original Section (c)(5)(ii) provides for an allocation as of the date when "necessary data" are available is misplaced.  Here, as discussed above, Section (c)(5) directs that two distinct methods must be used to allocate assets to segments.  Where the "necessary data" are "readily determinable" for the "segment," these data may be used to perform a "roll forward" calculation to the segment closing date by calculating "the amount of funds contributed by, or on behalf of, the segment, increased by income received on such funds, and decreased by benefits and expenses paid from such funds."  CAS 413.50(c)(5)(i).  If not, assets shall be allocated "in a manner consistent with the actuarial cost method or methods used to compute pension cost."  CAS 413.50(c)(5)(ii).  Unlike the revised CAS, nothing in the language of original Section (c)(5)(ii) permits the type of "hybrid" allocation method used in GE's 1988-starting asset allocation in this case.

The court finds GE's arguments to the contrary unpersuasive.  GE argues that the original CASB must have intended to permit allocations using the (c)(5)(ii) method to be made as of earlier dates because Section (c)(5)(ii) requires that the asset allocation must be made "on the basis of the actuarial cost method or methods used to calculate <u>prior years'</u> pension cost for the plan."  CAS 413.60(c)(2) (an Illustration of allocation of pension assets to segments) (emphasis added).  This language reflects a change in the proposed original CAS and the final promulgated original CAS.  In the proposed version, Section (c)(5) required contractors that used different actuarial cost methods in prior years to allocate assets to segments under Section (c)(5)(ii) using a specific type of actuarial cost method, regardless of the actuarial cost method that contractors had

29

actually used in the past.  CAS 413 Preamble § 9, 42 Fed. Reg. at 37,194.  In response to

several objections to this provision, Section (c)(5)(ii) was modified to allow for the

"allocation of assets in a manner consistent with the actuarial cost method or methods

used to give rise to such assets."  Id.  The Illustration of the use of Section (c)(5)(ii) in

CAS 413.60(c)(2) was modified to reflect this change, allowing for an allocation that was

based on "prior years'" actuarial cost methods.  CAS 413.60(c)(2).  However, nothing in

this Illustration suggests that a "roll forward" calculation is permissible under Section

(c)(5)(ii).  Although the CAS Illustration allows for consideration of "prior years'"

actuarial cost methods, CAS 413.60(c)(2), Section (c)(5)(ii) only requires that an asset

allocation be made in a manner "consistent with" these methods.

Indeed, nothing in CAS 413 suggests that original Section (c)(5)(ii) permits asset

allocation using a segment's share of actuarial liability calculated many years before the

segment closing date.  As discussed, such a method comingles the "roll forward"

calculation of Section (c)(5)(i) with the default allocation rule of Section (c)(5)(ii).  This

type of "hybrid" allocation method is not contemplated by the dual structure of original

Section (c)(5).  In light of this regulatory structure, the court also rejects GE's contention

that to require an asset allocation as of the segment closing date would create an

impermissible government "windfall" because such an allocation does not accurately

reflect the pension costs paid by the government.  The application of the standards of the

CAS as written does not create an impermissible "windfall" to the government.

Given the changes in Section (c)(5)(ii), GE's reliance on the court's statement in

Raytheon is also misplaced.  In Raytheon, the court found that under revised Section

30

(c)(5)(ii), a contractor must allocate assets as "closely as practicable upon the actual experience of the segment in the plan." 105 Fed. Cl. at 275. Although, as noted above, original Section (c)(5)(ii) attempts to capture some historical accuracy by using actuarial liability allocation bases actually used by the contractor, it does not contain the express language in revised CAS 413 that allows for a "roll forward" calculation. Thus, this court's interpretation of the 1995 CAS is not relevant to this particular issue. This court and the Federal Circuit have held in the <u>Teledyne</u> decisions that it is "illogical to say all the additional text of the [1995] amendment [to the CAS] simply 'clarified' rights that already existed, especially in light of the several clear changes made to the segment closing provision." <u>Allegheny Teledyne</u>, 316 F.3d at 1380. Without evidence to suggest that the 1995 CAS change was intended to confirm existing practice, the court sees no reason in this particular circumstance to conclude that the 1995 revision did not change the original 1979 CAS. See <u>DIRECTV</u>, 670 F.3d at 1376. To the contrary, the 1995 change in Section (c)(5)(ii) suggests that the original CAS did not permit the initial allocation and "roll forward" calculation supported by GE here. Accordingly, the court denies GE's motion for summary judgment on its reading of original CAS 413.50(c)(5)(ii), and finds that an asset allocation under that section must be made as of the date of the segment closing.

## C.   <u>Teledyne</u> share.

The parties next dispute two issues regarding the calculation of the <u>Teledyne</u> share. As discussed above, the <u>Teledyne</u> share represents the amount of pension surplus assets attributable to the government. GE moves for summary judgment that (1) funds

31

that GE contributed to the GEPP prior to September 1946, and (2) employee

contributions made to the GEPP between January 1, 1989 and the segment closing dates

should be included in the <u>Teledyne</u> denominator.  The government argues that these

amounts should be excluded from the <u>Teledyne</u> share calculation.  Together, these issues

account for an approximately $15 million difference in the parties' SCAO calculations

for both MAO and GEA.  The court now discusses each issue in turn.

> **1.      There are disputed issues of material fact as to whether the pre-1946 contributions should be included in the denominator of the <u>Teledyne</u> share.**

GE argues that it is entitled to summary judgment on including pre-1946

contributions[14] in the <u>Teledyne</u> share calculation on the grounds that it has demonstrated

with its expert's testimony and multiple historical documents that prior to September

1946, GE was accumulating funds in the partially-funded GEPP trust, and that these

funds contributed to the pension surplus at segment closing.  GE disputes the

government's contention that the pre-1946 contributions were made on a pay-as-you-go

("PAYG") basis and thus cannot be included in the <u>Teledyne</u> denominator because

PAYG plans do not generate actuarial gains or losses.  <u>Gen. Elec. Co. v. United States</u>, 92

Fed. Cl. 798, 811-13 (2010) ("Because non-compellable PAYG costs have been allocated

to government contracts based only on the actual payments made to retirees, no

---

[14] It is undisputed that the GEPP was funded on a pay-as-you-go basis from its inception in 1912 through 1927, and that these contributions should be excluded from the <u>Teledyne</u> denominator. Similarly, all parties agree that contributions made on or after September 1, 1946 should be included in the <u>Teledyne</u> share.  The only contributions at issue here are those between 1927 and 1946, but for ease of reference, the court refers to these contributions as the "pre-1946" contributions.  <u>See</u> Pl.'s Mot. at 28 n.13.

assumptions were used and no costs based on actuarial gains or losses were allocated to

government contracts.  In such circumstances, there are no 'previously determined costs'

that need to be adjusted in a CAS 413 segment closing adjustment.").  In support of its

motion for summary judgment, GE relies on a 1936 plan document that states that from

1927 onward, GE had made payments into its pension trust that it determined, "with

income from the securities held by the trust, . . . [would] supply the funds needed for the

payment of future pensions."  Pl.'s Reply, Ex. 86 at 7 (emphasis added).  This statement,

GE argues, indicates that the GEPP was not a PAYG plan.  In addition, GE relies on

several GEPP accounting documents that indicate that, from 1927 to 1945, the

contributions to the GEPP exceeded the amounts of benefits paid by the plan by about

$70 million.  GE argues that the government's own expert agreed that the partial funding

of the GEPP in excess of benefits paid for a particular year was "inconsistent with a

strictly pay as you go plan."  Pl.'s Mot., Ex. 4 at 31.  GE further contends that the

documents it relies on could be presented at trial in admissible form, and therefore may

be properly considered on summary judgment.  Based on this evidence, GE argues, the

pre-1946 contributions should be included in the Teledyne denominator.

   In support of excluding these payments from the Teledyne denominator, the

government argues that GE has produced no evidence that the GEPP provided

compellable benefits before 1946, leaving a disputed issue as to whether the pre-1946

contributions to the GEPP should be included in the Teledyne share.  The government

also objects to several of the documents that GE cites in support of its inclusion of the

pre-1946 contributions as inadmissible at trial and therefore not proper for consideration

on summary judgment.  Because the factual basis for GE's motion is in dispute, the government argues that summary judgment on this issue is inappropriate at this time.

The court concludes that summary judgment is not proper at this time.  Pursuant to RCFC 56(c)(2), the government has objected to the evidence supporting GE's assertions of fact as to the nature of the pre-1946 contributions on the grounds that it "cannot be presented in a form that would be admissible in evidence" at trial.  Although GE has filed a supplemental brief and several affidavits to address the government's objections, ECF Nos. 600-02, the court did not request this brief pursuant RCFC 56(e) ("If a party fails to properly support an assertion of fact . . . the court may: (1) give an opportunity to properly support or address the fact . . . ."), nor has the government been given a chance to respond to GE's supplemental brief.  The court will resolve this issue at trial or in a pre-trial motion in limine.

### 2.    Based on the undisputed facts, post-1988 employee contributions should be included in the denominator of the <u>Teledyne</u> share.

GE also seeks summary judgment on its contention that post-1988 employee contributions contributed to the GEPP's pension surplus and thus must be included in the <u>Teledyne</u> share.  As noted above, the purpose of the "CAS 413 segment closing adjustment is to identify where the government may have over or under contributed to pension costs under prior contracts," by calculating actuarial gains or losses that generate a pension surplus or deficit upon segment closing.  <u>Allegheny Teledyne</u>, 316 F.3d at 1381.  GE contends that it is undisputed that the investment earned on post-1988 employee contributions exceeded the interest rates credited to covered employees by an

34

average of 2.2% per year for the post-1988 period, thus creating actuarial gains. As such, GE argues, these contributions generated a pension surplus at segment closing, and should be included in the Teledyne denominator. GE further asserts that any qualitative differences between pre-1989 and post-1988 employee contributions do not change this fact nor justify exclusion of these contributions from the Teledyne share. Finally, GE argues that a year-by-year "tracing" of specific contributions to determine whether these contributions generated a pension surplus is not required by the Joint Guidance, which expressly recognizes that tracing specific surplus assets to specific contributions is not necessary, and often impossible, when calculating the Teledyne share. Joint Guidance at 2 of 6.

The government argues that summary judgment for GE should be denied because of changes made to the terms of the GEPP governing employee contributions in 1989. First, the government argues that, unlike pre-1989 employee contributions, the post-1988 contributions went into a "new, different account" called a Personal Pension Account that was credited with interest at a market-based rate. Def.'s Cross-Mot. at 32. The government asserts that amounts deposited into these accounts did not fund the GEPP's guaranteed retirement benefit because they could be withdrawn at any time before or after retirement eligibility with no reduction in the guaranteed benefit payable under the plan. Because of these features, the government argues that the Personal Pension Accounts are just savings accounts that are paid out at retirement or termination, and should not be treated the same as employee contributions that are intended to provide for retirement benefits. The government finally contends that while its expert opined that the

post-1988 contributions "appear[ed]" to contribute to the GEPP's pension surplus, a year-by-year analysis must be performed in order to reach this conclusion. Def.'s Cross-Mot., App. at 365.

After consideration of the parties' arguments, the court concludes that the post-1988 employee contributions at issue must be included in the <u>Teledyne</u> denominator. As described above, all parties agree that the post-1988 employee contributions were invested in the same manner as GE company contributions and that the asset return rate of the GEPP during that period exceeded the interest rate credited to employee contributions under the plan's terms by 2.2%. Expert Rebuttal Report of Colin England at 43. These facts establish that the employee contributions had the potential to and did generate actuarial gains in the same manner as other contributions to the GEPP. The government's asserted "differences" between the post-1988 employee contributions and other employee contributions to the GEPP—some of which are challenged by GE as simply false[15]—even if correct, do not alter this conclusion or otherwise require that the post-1988 contributions should be excluded from the <u>Teledyne</u> share calculation. The government has not argued that GE did not bear the risk of actuarial gains or losses on these employee contributions. Thus, the undisputed facts demonstrate that the employee contributions are the type of contributions that could generate a pension surplus.

---

[15] For example, GE points out that the government's expert conceded that employee contributions were deposited into hypothetical separate accounts and not accounts with segregated assets. Expert Report of Colin England at 16. In addition, GE asserts that it is untrue that post-1988 employee contributions could be withdrawn at any time, and instead could only be withdrawn after an employee left GE, consistent with the terms associated with prior employee contributions. Pl.'s Mot., Ex. 67 (a GEPP document describing withdrawals).

In addition, although the government argues based on its expert's opinion that a year-by-year analysis is necessary to determine whether the post-1988 employee contributions actually generated a pension surplus, such an analysis is not required by the Joint Guidance.  As recognized by the Joint Guidance:  "Given the complexity of pension accounting and the significant time period that must be considered in the [Teledyne share] calculations, tracing a segment closing surplus or deficit back to specific contributions made over the years that gave rise to it would require incredibly complicated calculations and historical data that, in most, if not all cases is not available." Joint Guidance at 2 of 6.  Instead, the Joint Guidance counsels that the methodology in calculating the Teledyne share, "by necessity, includes estimates and assumptions and provides a reasonable approximation given the circumstances," id., not a year-by-year analysis that ties surplus assets to specific contributions.  Moreover, given the undisputed facts establishing a surplus in the post-1988 period, any additional year-by-year analysis on specific contributions is not necessary.[16]  In short, post-1988 employee contributions generated surplus assets in the same manner as employer contributions and earlier employee contributions, and as such, should be included in the Teledyne denominator. GE is entitled to summary judgment on this issue.

---

[16] In fact, the calculation demonstrating that post-1988 contributions to the GEPP generated a surplus is a type of a year-by-year analysis because it tracks the growth of certain contributions for a specific time period.

### D.     GE may not reduce its SCAO with alleged future cost savings not actually realized by the government.

Finally, GE has moved for, and the government opposes, summary judgment with regard to the portion of GE's "measurable benefit" calculation that is based on the projection of future cost savings derived from pension surplus transferred by GE, but which has not yet been realized.  As briefly explained above, the Federal Circuit has held that a contractor's SCAO may be offset by the "measurable benefit" that the government has received as the result of any transfer of pension surplus incident to the sale of a segment.  DIRECTV, 670 F.3d at 1377-79.  The court now discusses GE's "measurable benefit" calculation and the parties' arguments in this regard.  The issue before the court is whether a projection of cost reductions that have not yet been realized by the government may serve as a permissible payment under the FAR to satisfy GE's SCAO.  For the reasons discussed below, the court denies GE's motion for summary judgment on this issue.

### 1.     GE's "measurable benefit" calculation.

After the 1993 sale of GEA to MMC and MAO to Westinghouse, all or part of the GEA and MAO segments were transferred to successor contractors, along with their pension plans.  MMC was merged with Lockheed to become the Lockheed Martin Corporation in 1995.  In 1997, Lockheed Martin Corporation sold a portion of the former GEA business to General Dynamics Corporation, and transferred surplus assets that were derived from the surplus originally transferred from GE to MMC.  Westinghouse transferred MAO, including the pension plan covering MAO employees, to Bechtel Plant

38

Machinery, Inc. in 1999.  The court will generally refer to the companies to whom surplus was transferred as "the buyers" and the transferors as "the sellers."

At the close of fact discovery in 2009, pension cost information was produced through 2009 for Lockheed Martin Corporation and through 2007 for General Dynamics Corporation and Bechtel Plant Machinery, Inc.  At the close of fact discovery, according to GE's expert, approximately $109 million of residual assets remained that were the product of the surplus assets transferred from the sellers of all or part of the relevant segments to the buyers.  Pl.'s PFUF ¶ 55.

To generally calculate the government's "measurable benefit," GE's expert calculated the present value as of the segment closing date of the difference between (1) the amount of pension costs the government pays to the buyers based on the amount of assets, including surplus, that was actually transferred to the buyers ("'actual transfer' scenario"), and (2) the higher pension costs the government would pay to the buyers assuming no surplus assets had been transferred to the buyers ("'no surplus transfer' scenario").  Expert Report of John B. McQuade at V-7.  A larger asset transfer in the "actual transfer" scenario decreases the amount of unfunded actuarial liability in a buyer's pension plan, decreases the pension cost to the buyer, and in turn decreases the government's share of the pension costs for relevant government contracts.  A larger asset transfer also produces more investment returns, which can also decrease costs.  Pension costs associated with unfunded actuarial liabilities are amortized by the buyers over either 10 or 30 years under CAS 412.  See id. at V-12 to 13.  GE's expert calculated

39

the difference for each segment for each year of the amortization periods, and then reduced these cost savings to present value as of the segment closing dates.  Id.

GE moves for summary judgment only for the portion of its "measurable benefit" calculation that projects into the future the costs in the "no surplus transfer" and "actual transfer" scenarios over these amortization periods for the years for which data are not available because of the close of fact discovery.  The parties refer to these projected cost savings as "future" or "hypothetical future" cost savings.  In this case, "future" means after 2009 for a portion of the GEA segment or after 2007 for a portion of the GEA and for all of the MAO segment.  The parties refer to the portion of the "measurable benefit" for years for which cost savings data were available as "past" cost savings.

To calculate the government's future cost savings, GE's expert had to make several assumptions using data from the past cost savings period.  In brief, GE's expert (1) used the last known business mix for each relevant business unit to project the government's business mix percentage for later years, (2) projected future costs based on the facts known at the end of the past cost savings periods, using the successor contractors' government-approved actuarial assumptions, (3) multiplied the business mix percentage by the projected costs for each later year, and (4) applied a discount rate to determine the 1993 present value of the cost savings.  Pl.'s PFUF ¶ 57.  Using information on pension costs as of 2009 or 2007, GE's expert provided calculations of the 1993 present value of future cost savings, which total $41.8 million for GEA and MAO together.  Id. ¶ 56.

Specific challenges to the details of the parties' calculations are not now before the court.  Rather, the government argues that as a matter of law, potential future cost savings not yet realized by the government may not be used to offset GE's SCAO because such projections are too speculative.  GE moves for summary judgment arguing that the future benefits derived from the surplus transfer must be given some value.  Put another way, GE argues that the government cannot ignore the undisputed fact that the future cost savings will almost certainly be more than zero.

### 2.    Parties' arguments.

In support of its motion, GE argues that the fact it cannot guarantee future cost savings by the government does not mean that those potential future savings must be reduced to "zero" for purposes of calculating the "measurable benefit."  GE contends that under this court's opinion in GE, GE must "be given the opportunity to prove what benefit, and how much of a benefit, the government has derived or will derive as a result of the surplus transfers [to successor contractors]."  84 Fed. Cl. at 152 (emphasis added).  GE also argues that "measurable benefit" is akin to contract damages and offsets, which generally are allowed if ascertained with "reasonable certainty," although not with "absolute" certainty.  Pl.'s Reply at 26-27 (citing, inter alia, Kan. Gas & Elec. Co. v. United States, 685 F.3d 1361, 1370-71 (Fed. Cir. 2012); Am. Savings Bank, F.A. v. United States, 519 F.3d 1316, 1323 (Fed. Cir. 2008)).  GE asserts that courts routinely calculate the present value of future benefits even though certainty is impossible.  GE further argues that the opinions of experts can be "leveraged to fill gaps" that contribute

to any uncertainty.  Energy Nw. v. United States, 641 F.3d 1300, 1307-08 (Fed. Cir.

2011).

GE asserts that to arbitrarily cut off credit for cost reductions that the government

is almost certain to receive would violate the CAS, FAR and the Federal Circuit's

holding in DIRECTV because to zero out future cost savings would essentially guarantee

a government windfall.  GE contends that forcing a seller that transfers surplus pension

assets to delay the "measurable benefit" calculation until all surplus assets have translated

into past cost savings could take decades.  In this regard, GE argues that it should not be

punished for failing to obtain records after the close of fact discovery.

In connection with the mechanics of the calculation, GE argues that neither expert

can claim that any assumptions made in projecting future cost savings would be more or

less favorable to the government, because future actuarial gains are just as likely as future

actuarial losses.  As such, GE argues, the government cannot contend that the

uncertainties in its future projections improperly disfavor the government.  Finally, GE

argues that it makes no sense for the government to disallow the use of future projections

for some purposes in calculating GE's ultimate segment closing adjustment payment, but

not others.  In particular, GE argues that it is inconsistent to use future projections to

calculate the SCAO under the CAS, but to bar their use to calculate the offsetting

"measurable benefit."

The government argues in response that GE's calculations of the government's

"measurable benefit" for the period beyond the close of fact discovery are too speculative

for this court to conclude that GE has met is burden of demonstrating a cost reduction to

the government under the FAR.  In particular, the government argues the Allowable Cost and Payment Clause mandates that the government must receive actual payment, not estimated projections, to satisfy the SCAO.  The Allowable Cost and Payment Clause provides in relevant part that a contractor "<u>shall pay</u> to the Government any refunds, rebates, credits, or other amounts . . . . accruing to or received by" the contractor.  48 C.F.R. § 52.216-7(h)(2) (emphasis added).  The plain language of this provision, the government argues, demonstrates that only absolute, not speculative, cost reductions may be used as payment by GE.

The government characterizes GE's calculation of the government's future cost savings from the pension surplus transfer as a "pyramid of speculation."  Def.'s Cross-Mot. at 34.  In particular, the government argues the entire calculation is based on projections that assume that every variable bearing on the calculation of future pension costs would remain unchanged in the future.  Such speculation, the government argues, cannot satisfy GE's burden of demonstrating actual payment.  A contrary holding, the government further contends, would expand the allowable forms of payment under the Allowable Cost and Payment Clause and the Credits Clause in an unprecedented manner.

The government also argues that, given the need for FAR compliance, the damages cases relied on by GE are inapplicable.  The government concedes that, in modeling damages, assumptions have to be made about future events.  However, the government contends that projections are permissible in the case of damages because damages are being awarded against a wrongdoer who is "not entitled to complain that [damages] cannot be measured with the exactness and precision that would be possible if

43

the case, which he alone is responsible for making, were otherwise." Story Parchment

Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931).  The government argues

that here, it is not a wrongdoer, but instead a contracting party that is entitled to be paid

the amount of the SCAO that GE owes.  The government argues that GE, not the

government, chose to confer this particular type of "measurable benefit" payment on the

government to satisfy its SCAO, and that the government is not required to accept this as

payment of a cash obligation based on nothing more than the possibility of future benefit.

### 3.    A cost reduction under the Credits Clause must be a realized cost reduction and cannot include projected cost reductions.

The court holds that, as a matter of law, GE may not offset its payment obligation

based on a cost reduction the government has not actually received.  The court's

conclusion is based on the language of the Allowable Cost and Payment Clause, 48

C.F.R. § 52.216-7(h)(2), and the Credits Clause, 48 C.F.R. § 31.201-5.  Both clauses

govern the payment of GE's SCAO and have been incorporated into the government

contracts at issue.  The Allowable Cost and Payment Clause provides that GE must

refund the government for a pension surplus arising after a segment closing:

> The Contractor shall pay to the Government any refunds, rebates, credits, or other
> amounts (including interest, if any) accruing to or received by the Contractor or
> any assignee under this contract, to the extent that those amounts are properly
> allocable to costs for which the Contractor has been reimbursed by the
> Government.

48 C.F.R. § 52.216-7(h)(2) (emphasis added).  This provision is implemented through the

Credits Clause, which states:

> The applicable portion of any income, rebate, allowance, or other credit relating to any allowable cost and received by or accruing to the contractor <u>shall be credited</u> to the Government either as a cost reduction or by cash refund.

FAR § 31.201-5 (emphasis added).

The Federal Circuit has held that a contractor's payment of its SCAO under these clauses may, with the government's acknowledgement, take the form of a "cost reduction" derived from a transfer of surplus pension assets to the buyer of a segment. <u>DIRECTV</u>, 670 F.3d at 1377-79.  However, the Allowable Cost and Payment Clause also requires that a contractor "shall pay" to the government the government's share of pension surplus assets.  48 C.F.R. § 52.216-7(h)(2).   Similarly, the Credits Clause states that a refund "shall be credited" to the government through a cost reduction.  48 C.F.R. § 31.201-5.  The mandatory "shall pay" and "shall be credited" indicate that actual payment—or in this case, realized cost reductions—must be received by the government to satisfy the contractor's segment closing adjustment obligation.

GE bears the burden of demonstrating that payment has been received by the government.  As this court held in <u>General Electric Co. v. United States</u>, 84 Fed. Cl. 129, 151-52 (2008), in order to establish an offsetting cost reduction, GE would "be required to show, as a matter of fact, that the government has received or will receive the benefit of the surplus in the hands of the buyers. . . . If GE can demonstrate that the government derived a measurable benefit from the pension surpluses transferred by GE . . ., then the court finds that GE will be entitled to a credit towards its segment closing adjustment

obligation for the amount of the benefit derived by the government."[17]  Given the court's interpretation of the FAR the court cannot accept GE's claim of a "measurable benefit" to the government based on projected, but not yet realized, government savings.

Contrary to GE's contention, the law regarding the calculation of future damages has no place in interpreting the Allowable Cost and Payment Clause and Credits Clause. Both clauses are contract terms that govern payments, and these payments are not damages.  Thus, the standards for calculating future damages or offsets meant to remedy an injury experienced by a contracting party are not applicable.  GE has not identified and the court has not found any precedent that supports the use of actuarial projections to meet its payment obligations under the Credits Clause and Allowable Cost and Payment Clause.  Regardless of whether GE's calculations are actuarially valid, the fact remains that GE cannot demonstrate that the government is guaranteed payment with regard to future periods.  Because the payment is not guaranteed, GE cannot meet its burden of establishing payment under the terms of its contracts with the government.

For this same reason, GE's argument regarding receipt of a government "windfall" must be rejected.  In DIRECTV, the relevant question before the court of appeals was whether a pension cost reduction derived by the government from a surplus transfer could, under any circumstance, give rise to a credit under the Credits Clause that could be applied against a seller's segment closing payment obligation.  670 F.3d at 1376.  This

---

[17] Although the court indicated in its prior opinion that GE must show that as a "matter of fact" the government has or "will receive" a benefit from the pension surplus assets transferred by GE, the court now concludes that its use of "will receive" may not imply that GE may satisfy its burden through a projection of cost reductions that have not in fact been realized by the government.

question was answered in the affirmative, in part because to ignore an actual benefit received and acknowledged by the government would result in a double recovery or a windfall that is prohibited by the CAS statute.  Id. at 1378 (citing 41 U.S.C. § 422(h)(3)).  However, the court finds that the issue before the Federal Circuit in DIRECTV is fundamentally different from the one present here.  The court must now determine whether, in addition to an actual benefit received, a projection of potential future benefits that the government has not yet received can be used by a contractor to satisfy its segment closing payment obligation under the FAR.  Based on the language of the Allowable Cost and Payment Clause and the Credits Clause, the court concludes that it may not.  Because GE cannot establish with certainty the cost saving benefits that may accrue to the government in the future, GE cannot establish that the government will receive an actual "windfall" in violation of the CAS statute.

In sum, the court holds that GE can only claim a credit for cost reductions the government has actually received because these are the equivalent of payments under the FAR.  GE cannot claim credit for pension cost reductions the government has not yet realized and may not realize.  At the time of segment closing, with permission of the government, GE transferred excess pension assets, which have reduced the government's pension cost obligations.  GE has been able to satisfy its SCAO payment, at least in part, through the pension surplus transfer.  However, GE goes too far to claim credit for reduced pension costs it concedes have not yet been realized and which it cannot guarantee.   Nonetheless, the court agrees with GE that given the unique circumstances of this case, where the law has been uncertain and where a final segment closing adjustment

47

must await trial, the court should allow the parties to engage in limited fact and expert discovery up until their pre-trial submissions to prepare a final calculation of the full credit realized by the government from GE's pension surplus transfers.[18]

## IV.    CONCLUSION

For the reasons discussed, the court **GRANTS-IN-PART** and **DENIES-IN-PART** GE's motion for partial summary judgment, and **GRANTS-IN-PART** and **DENIES-IN-PART** the government's cross-motion.  The court **DISMISSES** the government's counterclaim regarding the MAO segment.  The court holds that (1) the (c)(5)(i) asset allocation method must begin at the creation of the segment; (2) disputed issues of fact remain as to whether GE's 1952-starting asset allocation calculation under Section (c)(5)(i) complies with the CAS; (3) if the court determines that Section (c)(5)(ii) must be used in this case, the (c)(5)(ii) asset allocation must be made under the applicable CAS as of the date of the segment closing; (4) there are disputed issues of material fact as to whether the pre-1946 contributions should be included in the <u>Teledyne</u> denominator; (5) post-1988 employee contributions must be included in the <u>Teledyne</u> denominator; and finally (6) GE may not receive credit for future cost reductions not actually realized by the government.  To the extent that cost reductions have been realized between the close

---

[18] The court recognizes that the issue of future cost savings arises in part because this case involves a situation in which the rules for segment closings before the 1995 CAS revisions were not fully fleshed out.  Because of the evolving nature of the law governing segment closing payments under the original CAS, the significance of certain contractual arrangements were not fully understood at the time that the segment closings at issue occurred, and may have been different had the law been settled at the time of the segment closings.  Nonetheless, GE may still offset its SCAO payment by any cost savings that it can demonstrate the government has in fact realized through GE's transfer of surplus pension assets to successor contractors.

of fact discovery and trial in this case, the court will reopen discovery for the limited

purpose of determining those cost savings.

Several issues identified in the briefs remain to be resolved at trial.  By **August 15,**

**2013**, the parties shall file a joint status report, detailing <u>all remaining disputed issues</u> in

this case that must be resolved in order to enter final judgment.  The joint status report

should include a proposed schedule for pre-trial submissions with the goal of holding trial

in December 2013.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge